## W. H. Thornley v. The State.

No. 17159.   Delivered January 23, 1935.
Reported in 78 S. W. (2d) 601.

The opinion states the case.

*Jeffers & Gregg,* of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is rape; the punishment, confinement in the penitentiary for 99 years.

Prosecutrix, Clara Smith, who was eight years of age, lived with her mother, Mrs. Ida Smith, and two small brothers, aged ten and twelve, in the city of San Antonio.   Russell Moore, who was eighteen years of age, lived in the same home.   Appellant, who was twenty-four years of age, was a corporal in the army.

He frequently visited in the home of prosecutrix, and, according to his testimony, was having sexual relations with Mrs. Ida Smith. However, this was denied by Mrs. Smith. On the night of the alleged rape Mrs. Smith had gone to a picture show with one Steves, a private in the regular army. She left at her home a soldier by the name of Talley, appellant, Russell Moore, her two small sons, and prosecutrix. She returned from the show about 9:30 p. m. According to her testimony, when she reached home the lights were out and the door locked. Appellant let her in. She testified that he was "as pale as a sheet," and that when she asked him to account for his demeanor, he made no reply. Finally he told her that prosecutrix had cried herself to sleep. We quote from her testimony as follows: "I picked the baby up, (referring to prosecutrix) and took her in the kitchen and bathed her face with a wet towel, and again asked her what the matter was, and she said it was a man. I asked Thornley (appellant) if he knew about the baby being hurt and he said he knew nothing. I said 'Thornley are you guilty of this?' and Thornley answered that it didn't make any difference to me whether he was guilty or not guilty."

Finally appellant stated to the witness that he did not know who was guilty. Prosecutrix would not tell her mother who had assaulted her. On the night of November 12, 1933, the date of the alleged rape, prosecutrix was examined by a physician at the hospital at Fort Sam Houston, who testified that he made the examination between 9 and 11 o'clock at the instance of prosecutrix's mother. He testified further that prosecutrix's night dress was stained with blood and that there was blood on her thigh and over her abdomen; that the hymen was lacerated; that the hymen had been penetrated shortly prior to the time he made the examination; that he did not know whether prosecutrix had been penetrated by a man; that Mrs. Smith told him she thought she knew who committed the assault but was not sure; that prosecutrix said that she did not know who assaulted her.

Prosecutrix testified, in substance, as follows: After her mother had gone to the picture show appellant told her and her brothers to go to bed. She started to bed in the room with her brothers, but appellant told her to go into another room. After she had gone to bed appellant came into the room, got in bed with her, and raped her. She screamed and Russell Moore came to the door and asked appellant why she was crying. Appellant replied that there was nothing wrong. Moore

then went back to bed. She did not tell her mother or the doctor who examined her that appellant was guilty because she was afraid of him. When she screamed appellant said: "You shut up, you little brat or I will slap your face for you."

Prosecutrix's two small brothers testified to having heard her scream and further to having heard appellant say "Shut up, you little brat." Moreover, they testified that appellant came from prosecutrix's room after she screamed and went to the kitchen where he washed his hands. He was dressed in his underwear.

Russell Moore had not been found and did not appear as a witness. Appellant introduced in evidence, without objection on the part of the State, an affidavit made by Moore two days after the alleged assault. We quote the pertinent portions of the affidavit as follows: "About 6:45 p. m. the soldier called 'Pest,' came to the house, and took Mrs. Smith to the Post Theater at 6:50 p. m. 'Pest' is from the 9th Infantry. I have known 'Pest' about a month. I have seen him at Mrs. Smith's house two times, but have seen him at the camp in Frogtown many times. Corporal Thornley was at the house when the soldier known as 'Pest' and Mrs. Smith left for the show. I went to bed at about 7:30 p. m. and about 15 minutes after I went to bed I heard little sister scream. I got up and went into the front room and I heard Clara Smith say, 'Thornley, I am going to tell my mother on you.' I then went back into the room where I slept and Louis asked me what was the matter with little sister, and in about five minutes I heard her crying again. I stayed in my room but someone had turned on the light in the front room and then someone turned out the light, then about five minutes later I heard sister scream again. Corporal Thornley got up, went to the kitchen, turned on the light, got himself a drink. When Corp. Thornley went into the kitchen to get a drink he had his breeches off. After getting a drink he put his breeches on, then he went in the dining room and sat there with his hand over his eyes as though he was thinking hard. Then I went to sleep. Later Mrs. Smith came in and woke me up and told me to stay up that she was taking the baby to the hospital and no matter how late it was to stay up until she got back. When she left Corp. Thornley was in the dining room, saying 'I didn't do it.' He stayed there until Mrs. Smith got back. When Mrs. Smith returned from the hospital she told Corp. Thornley how about the baby was hurt; she told him 'if you had any guts, you would take a gun and blow your brains out.' He told her, 'I didn't do it.' Then little sis-

ter said, 'Yes, you did, Thornley, you know that you are lying.' Then Mrs. Smith told me to go and call the M. Ps. When the M. Ps. came there Thornley was gone. Mrs. Smith told us to go to bed. I went to bed, then she talked to the M. Ps. further than that I do not know anything."

Several witnesses for appellant testified to the fact that prosecutrix had not identified appellant as her assailant on the night of the alleged assault. One of these witnesses testified that prosecutrix told him that her assailant was wearing leggings and that he was a thin man wearing a hat with a blue cord. It appears that appellant did not belong to the infantry, but was a member of the artillery, which uses a red hat cord. Some of appellant's witnesses testified that prosecutrix's mother had expressed doubt to them as to appellant's guilt. Others testified that the mother had stated to them that she did not know who committed the offense. One of appellant's witnesses testified that she lived next door to prosecutrix; that on an occasion some days prior to the assault she saw prosecutrix sitting in Russell Moore's lap; that they were engaged in hugging and kissing. There was proof on the part of appellant to the effect that Russell Moore left the home of the prosecutrix two days after the alleged assault, and had not returned.

Appellant testified that he was in the home of prosecutrix on the night of the alleged assault and remained there until Mrs. Smith returned from the picture show; that he had on his uniform and was asleep on a cot in a back room when he was aroused by someone crying; that he immediately went to the front room where prosecutrix was in bed and asked her why she was crying; that she did not reply, and he told her to go to sleep; that when he turned on the light in the front room he saw Russell Moore standing in the doorway; that when he told Moore that prosecutrix was crying because her mother had not taken her to the picture show Moore went back into another room; that when Mrs. Smith returned she accused him (appellant) of having assaulted prosecutrix, and he told her that she was a liar; that at no time had he had or attempted to have sexual intercourse with prosecutrix.

Bill of exception No. 1 recites that appellant's witness Ruby Windgrobe had given material testimony in appellant's behalf to the effect that on an occasion prior to the alleged assault she had seen prosecutrix sitting in Russell Moore's lap and that they were hugging and kissing each other. Before taking the stand the witness had requested that she be permitted to affirm, and the request had been granted. In the course of her cross-

examination the district attorney said to her: "I notice you didn't swear to God to tell the truth when you took the witness stand. Will you tell us why?" Counsel for appellant excepted. The court then asked the witness if she requested to take the oath of affirmation rather than to swear and the witness replied in the affirmative. Further the court asked the witness to tell the jury her reason, and the witness replied: "Because it is against my religion."

It is appellant's contention that the procedure reflected by the bill is violative of section 5, article 1, of our Constitution, which provides that no person shall be disqualified to give evidence in any of the courts of this State on account of his religious opinion or for the want of any religious belief, and that all oaths and affirmations shall be administered in the mode most binding upon the conscience and shall be taken subject to the pains and penalties of perjury. Specifically, it is urged that the witness was improperly impeached. Appellant cites Brink v. Stratton (Court of Appeals of New York), 68 N. E., 148, in which it is held that a witness may not be impeached by showing that he does not believe in the existence of a Supreme Being who would punish him for false swearing. The holding was not concurred in by two of the justices. Again it was noted in the opinion that there had been a contrary holding in Stanbro v. Hopkins, 28 Barb., 265, and People v. Most, 128 N. Y., 108. Further it is shown in the opinion that in Iowa the rule in the Stanbro Case had been adopted as disclosed in Searcy v. Miller, 57 Iowa, 613, and State v. Elliott, 45 Iowa, 486, whereas in Virginia and Kentucky it is held that a witness cannot be interrogated as to his belief in the existence of a Supreme Being, or a future state for the purpose of affecting his credibility. See Perry's Case, 3 Grat. 632, and Bush v. Commonwealth, 80 Ky., 244. Appellant cites other cases to the same effect, among them being People v. Copsey (Supreme Court of California), 12 Pac., 721, and Winter v. Winter (Supreme Court of Pennsylvania), 156 Atl., 603.

We deem it unnecessary to decide whether, in our opinion, the cases relied upon by appellant lay down a correct doctrine. Here it was merely elicited from the witness that it was against her religion to swear. It was not attempted to show that she did not believe in a Supreme Being. Appellant's counsel, upon redirect-examination, elicited from her the fact that she belonged to the Pentacostal Church and that it was her belief that the Bible taught that it was wrong to swear. In response to questions by counsel for appellant, she said: "I affirm and

under my religion it is wrong to lie, or to affirm and then lie. I feel I am under a solemn obligation to tell the truth and have told it." Manifestly, we are not concerned with a case in which it was attempted to impeach a witness by showing she did not believe in the existence of a Supreme Being. We are not led to believe that appellant could have been in any manner injured by the questions and answers shown in the bill of exception.

Appellant's bill of exception No. 2 deals with the action of the trial court in permitting the district attorney to bring prosecutrix into the courtroom and have the witness Ruby Windgrobe identify her as the girl she claimed had permitted Moore to hug and kiss her. We are constrained to overrule the contention that the bill reflects error.

In his motion for new trial appellant alleged that, since his conviction, he had discovered new testimony. In support of the averment he produced the affidavit of Eula Heath which was to the effect that on several occasions she had seen Russell Moore pass the tent in which she lived carrying prosecutrix on his shoulders, with her "legs astride his neck," and that said parties appeared to be very friendly and intimate. Further, the affidavit was to the effect that on other occasions she had seen Moore with his privates exposed, abusing himself and talking profanely. It was stated in the affidavit that she did not disclose what she knew about the matter until after the verdict had been returned; that she then went to one of appellant's counsel and told him of the occurrence. Again, it is stated in the affidavit that she was not personally acquainted with appellant, and that no one had ever come to her and talked to her about the case.

It appears that neither appellant nor his counsel testified upon the hearing of the motion, or made affidavit, negativing knowledge of the incident referred to. It was not shown by affidavit or otherwise that due diligence was used by appellant and his counsel in preparing his case for trial. This was essential. Section 198, Branch's Annotated Penal Code; Wilson v. State, 37 Texas Crim. Rep. 156. Moreover, it is observed that the affidavit of Mrs. Heath alone was presented with the motion for new trial. The motion for new trial is signed by appellant's counsel. It was not sworn to by either appellant or his counsel. It is a well-settled rule that a motion for new trial on the ground that new testimony material to the defendant has been discovered since the trial must be sworn to. Branch's Annotated Penal Code, sec. 193; Martin v. State, 124

S. W., 683. We think it is clear that the proposed testimony would not likely change the result if a new trial were granted. The affidavit of Russell Moore, introduced by appellant, tended to inculpate appellant and to exonerate Moore. In the light of the entire record, we are unable to discern how the proposed new testimony is inconsistent with the State's case. . See Branch's Annotated Penal Code, sec. 201; McFadden v. State, 71 S. W., 972.

Failing to find error, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.