**INTEGRATED CIRCUITS UNLIMITED, INC., Plaintiff,**

v.

**E. F. JOHNSON COMPANY, Defendant.**

**No. 84–CV–3971 (JBW).**

United States District Court, E.D. New York.

Aug. 10, 1988.

Paikin & Mielo, P.C. by Michael L. Paikin, New York City, for plaintiff.

Morrison & Foerster by Joseph C. Markowitz, New York City, for defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

Plaintiff seeks to recover damages in the sum of $160,725, allegedly the balance due on invoices for microprocessors ordered by defendant. Uniform Commercial Code § 2–709. Defendant contends that certain of the microprocessors were defective, and that in any event plaintiff could have sold the rejected product without loss. U.C.C. § 2–708. It counterclaims for refunds and credits totaling more than the invoices on which it has withheld payment. The case was tried without a jury.

### I. Facts

Plaintiff Integrated Circuits Unlimited, Inc. ("ICU") is a New York-based distributer of electronic components. Defendant E. F. Johnson Company ("Johnson") is a Minnesota-based manufacturer of two-way taxi radios. In the winter and spring of 1984, a shortage developed of a particular microprocessor, known as model no. 8748, needed by Johnson to fulfill certain of its contracts. Unable to obtain it from its usual sources, Johnson purchased the part from ICU. In March of 1984, Johnson placed three purchase orders with ICU: WO4746 for 2,500 UPD8748 microprocessors at $85.00 each, WO4747 for 2,500 D8748H microprocessors at $87.50 each, and WO4750 for 1,100 D8749 microprocessors at $120.00 each.

Between March 21, 1984 and April 13, 1984, ICU delivered to Johnson 1,709 UPD8748 microprocessors pursuant to purchase order number WO4746, about 70% of the total order. The deliveries were made in four shipments. Johnson received shipments containing 130 and 150 on March 21 and 22 respectively, for which it gave ICU payment in full of $23,800.00 on March 30. It subsequently received 829 on April 11, and 600 on April 13. Between March 23 and April 7, Johnson received all 1100 ordered under purchase order WO4750, for which it paid in full $132,000.00.

On April 24, Johnson sent ICU a letter rejecting the 130 parts from the March 21 WO4746 shipment based on tests indicating that the devices were of substandard quality. The letter said that Johnson's acceptable quality level—the number of devices which can be defective without rendering the entire shipment unacceptable—was 1%. It attached a memorandum summarizing results of laboratory tests in which six of the devices, or 4.6%, had failed. The next day Johnson sent ICU a similar letter regarding the WO4750 units. It stated that out of 115 devices tested 113 had failed, and offered their return for credit. The attached memorandum summarizing the test results indicated that 113 had failed when subjected to temperatures higher than the maximum required by commercial standards and Johnson's own procurement specifications. Three devices had failed at the agreed-upon standard temperature, a failure rate of 2.6%. All tests were conducted by an independent laboratory.

On May 8, Johnson sent ICU an itemized list of 1,973 parts it wished to return based on the laboratory tests. Not all of these parts had been individually tested. Rather, the rejections were premised on the laboratory results previously summarized in the memoranda sent to ICU. These results were based on tests of a sampling of each type of device. Under separate cover it sent to ICU 18 samples of the rejected devices so that ICU could conduct its own tests, and issued debit memoranda for the value of these parts.

From May until August, Johnson wrote and called ICU repeatedly requesting authorization to return the rejected parts. ICU declined to accept the returns. It continued to press for payment of its invoices. On May 21, Johnson sent ICU a check for $70,465, payment in full for the 829 parts

received on April 11. On July 25, ICU reported to Johnson that its own tests had found that only one device out of 19 failed at commercial tolerances.

Johnson informed ICU on August 15 that it was returning the rejected parts "no matter what." It shipped them back to ICU, debited ICU's account $170,450.00 (the value of the rejected parts minus the 18 samples already sent back and debited), and withheld payment on two ICU invoices: the $51,000 allegedly owed for the 600 parts received on April 13 and $109,725 owed for parts shipped pursuant to purchase order WO4747, a total of $160,725. ICU refused delivery of the rejected parts. They were returned to Johnson, which has since held them on ICU's account.

## II. Findings of fact and conclusions of law

### A. Johnson's rejection was justified

■ A buyer is entitled under the U.C.C. to reject goods which fail to conform to the contract. U.C.C. § 2–601. The court concluded preliminarily on the trial record that Johnson's rejection of 1,973 parts was wrongful because less than five percent of the microprocessors from each order, proportional to the percent which had proven defective during testing, were nonconforming. Upon further consideration of the relevant testimony, however, the court finds that the defects rendered the shipments which contained defective parts nonconforming in their entirety.

The court's preliminary finding was primarily based on the testimony at trial of ICU's expert witness that the acceptable defect rate for electronic parts in the microprocessor industry is five percent. Under this standard, rejection of the parts based on a defect rate of less than five percent would be unjustified. Although the court initially credited this testimony, it noted on the record that the witness's conclusion was counterintuitive and his presentation confusing. It was also contrary to industry publications and to the testimony of defendant's employees who impressed the court as sound and honest technicians even though they did not have industry-wide experience.

Having reconsidered the testimony of plaintiff's expert in light of the witness's qualifications, his demeanor on the stand, and the implications of his conclusions, we decline to credit it. Manufacturers such as Johnson which incorporate many component parts into their radios could not produce a reliable product if each of those parts had a five percent chance of being defective. Even if a radio contained only five component parts, for example, a five percent failure rate for each part would result in a probability that one in four such radios had at least one inadequate component, since the independent probabilities would be multiplied. In fact, the credible testimony and exhibits suggest that the industry requires a failure rate much lower than one percent, the lowest standard claimed by Johnson in its correspondence.

The fact that Johnson tested some of the parts at somewhat higher temperatures than they were required to withstand by commercial standards is not decisive. Regardless of what happened at the higher temperatures, the tests showed that an unacceptable percentage of the parts failed to perform adequately at the agreed-upon temperature.

Johnson tested an adequate sample of the microprocessors before deciding to reject them. It tested eight percent (130 out of 1709) of the rejected WO4746 devices, and all of the rejected WO4750 devices. In the case of the former, the 130 devices which were sent to the laboratory were identical to the devices rejected based on the test results. While the sampling was not scientifically randomized, selection for testing was made without bias. It sufficed as a basis for commercial rejection in this case.

It was reasonable for Johnson to conclude that the remaining untested devices were similarly defective without sending all of them to the laboratory for expensive tests. *See Union Paint & Varnish Co. v. Dean*, 48 R.I. 288, 290, 137 A. 469 (1927) (in an action for the price of an unopened drum of paint, evidence that paint of the

same brand, bought from the same salesman five months earlier, had caused damage to a roof could be used to determine whether the unopened drum was also defective). *See also* James, Relevancy, Probability and the Law, 29 Calif.L.Rev. 689, 692 (1941); Cohen, Conceptualizing Proof and Calculating Probabilities: A Response to Professor Kaye, 73 Cornell L.Rev. 78 (1987) (factual determinations can be premised on statistical probability if the statistical sample is large enough to ensure probability of accuracy); Kaye, Apples and Oranges: Confidence Coefficients and the Burden of Persuasion, 73 Cornell L.Rev. 54 (1987). The work of professors Kaye and Cohen, while disagreeing in some particulars, along with that of James, support the conclusion that the statistical probabilities here were high enough and sufficiently reliable to warrant rejection by a manufacturer of these electronic devices.

[The detailed calculations of damages are omitted from the published opinion.]

B. Johnson's rejection was effective regardless of whether it was justified

■ The seller's remedies for a rejection of goods which is "ineffective" because the buyer failed to follow proper procedures are distinct from the remedies for a rejection which is "wrongful" because it was unjustified. If Johnson's rejection had been wrongful but nevertheless effective, ICU would not be entitled to maintain an action for the price.

Section 2–709 allows an action for the price only if the goods have been "accepted" (or are lost, damaged, or non-resalable, none of which are true in this case). Section 2–606, in turn, defines acceptance as "failure to make an *effective* rejection" (emphasis added). It is cross-referenced to § 2–602(1), which provides that a rejection of goods must be made "within a reasonable time after their delivery or tender," and is *"ineffective* unless the buyer seasonably notifies the seller" (emphasis added). Thus, the remedy for an ineffective rejection—one which is procedurally defective under § 2–602(1)—is an action for the price.

By contrast, a *wrongful* rejection may still be an effective rejection, and does not in itself entitle the seller to the price. Since an ineffective rejection constitutes an acceptance, by negative inference any effective rejection—whether or not it is justified—bars acceptance and protects the buyer from § 2–709 damages. Subsection (3) of § 2–602, which is *not* cross-referenced to the § 2–606 definition of acceptance as ineffective rejection, makes separate mention of goods "wrongfully" rejected. It provides that the remedies in cases of wrongful rejection are contained in § 2–703, entitled "Seller's Remedies in General." Subsection (e) of § 2–703 states that the measure of damages for goods wrongfully rejected is the difference between the contract price and the market price (§ 2–708), or "in a proper case the price" under § 2–709. Thus, a seller whose goods have been wrongfully rejected will be entitled to the price only if that measure of damages is "proper" under § 2–709 because the rejection was also procedurally ineffective.

This interpretation is supported by both the U.C.C. commentaries and by the authorities. The official commentary to § 2–602, the section setting forth procedures for an effective rejection, states that subsection (3) on wrongful rejections was included only to emphasize the "sharp distinction" between the rules governing procedures for making an effective rightful rejection and those governing "non-acceptance which is a breach"—*i.e.*, procedurally effective rejection (non-acceptance) which is wrongful. Professors White and Summers, in their treatise on the U.C.C., analyze the issue as follows:

All commentators agree that the Code drafters contemplated effective *rejections* which might be substantively wrongful and intended that all such rejections forestall acceptance without regard to their substantive wrongfulness. Writing for the New York Law Revision Commission, Professor Honnold stated: "buyer may have the power to make an 'effective' rejection even though his action is in breach of contract and subjects buyer to liability for damages."

. . . .

It is important to distinguish between "wrongful" rejections and "ineffective" rejections. As we use the term (and as we believe the drafters intended the term to be used), a rejection of a conforming tender would be a wrongful rejection. Nevertheless if timely notice was sent and if the buyer lived up to his post rejection obligations under section 2–602 and those following, the rejection though "wrongful" would be "effective" and would so preclude his acceptance of the goods and foreclose a consequent liability for the price under 2–709(1)(a).

J. White & R. Summers, *Uniform Commercial Code*, 258, 314 (2d Ed.1980) (footnotes omitted). One court has specifically held:

> The trial court's statement during trial that "a wrongful rejection ... would constitute an acceptance" is not correct. The remedies for wrongful rejection are separately set out and do not include treating that action as an acceptance. An *ineffective* rejection may be an acceptance.

*Blue Sky Forest Products, Inc. v. New Hampshire Doors Co.*, 663 P.2d 813, 813 n. 1, 36 U.C.C. Rep.Serv. 1179, 1182 n. 1 (Oreg.Ct.App.1983) (citations omitted) (emphasis in original).

Johnson's rejection of the microprocessors was effective. It met the requirement in § 2–602 that a rejection be made within a reasonable time after delivery or tender, and that the buyer seasonably notify the seller.

Time to test complex electronic parts must be afforded. Here testing by the independent laboratory retained by Johnson was prompt and thorough. Immediately after learning that the test results had revealed excessive flaws in the microprocessors, Johnson notified ICU of these results and of its intent to reject the parts. Less than two weeks later, it sent ICU an itemized list of parts being rejected. Its letter of May 8 satisfied the requirement of § 2–605 that the buyer set forth the nature of the defect with sufficient particularity to allow the seller to cure it.

■ The fact that Johnson took temporary physical possession of the microprocessors and even used some of them before rejecting them does not mean that it accepted them. Those actions were taken during the time required to complete the tests. Section 2–606 provides that acceptance of goods does not occur until the buyer has had a "reasonable opportunity to inspect them." *See Barrett Paving Materials, Inc. v. United States Fidelity and Guaranty Company*, 118 A.D.2d 1039, 500 N.Y.S.2d 413 (3rd Dept.1986) (whether use of product constituted acceptance was a question of fact because of the substantial time and special conditions needed to test it). *Cf. Shokai Far East Ltd. v. Energy Conservation Systems, Inc.*, 628 F.Supp. 1462 (S.D.N.Y.1986) (use of goods *subsequent* to testing them constituted acceptance under the U.C.C.).

■ Nor did Johnson waive any rights by paying for the microprocessors after it had rejected them. The payments represented an effort on the part of Johnson to resolve the dispute amicably. *See Barrett Paving Materials, Inc. v. United States Fidelity and Guaranty Company, supra* (payment for goods is not dispositive of whether they were accepted).

Thus, even if Johnson's rejection of the microprocessors were substantively wrongful, ICU would not be entitled to maintain an action for the price. The proper measure of damages would be the difference between the contract price and market price at the time of delivery plus incidental damages. U.C.C. § 2–708.

ICU would receive no damages under this measure. At the time of delivery, the market price of the microprocessors in question was inflated because demand for them had outstripped supply. The price paid by Johnson was the then current market price. There is no merit to ICU's argument that the witness who testified that $30 was the "standard cost" actually meant that $30 was the market price. If the parts were available on the market for that price, Johnson would not have had to pay nearly three times that much to an unfamiliar supplier. ICU could have sold those units which were not defective for the same price it was charging Johnson.

### C. Johnson's actions following the rejection were proper

 Section 2–602 requires that a buyer hold rejected goods with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them. Johnson fulfilled this duty. It held the microprocessors in storage for three months, during which time they remained in good condition, without physical deterioration as a result of the testing or the passage of shelf time. Throughout those months it unsuccessfully sought authorization from ICU for return of the microprocessors. When it attempted to ship them back without such authorization, ICU sent them back. Thus, although the market price of the parts began to fall in September of 1984, Johnson is not liable to ICU for any damages incurred as a result of that subsequent price fluctuation.

Johnson was not required under § 2–603 to resell the rejected parts. Since Johnson received no instructions from ICU with respect to disposition of the parts after it gave notice of rejection, it was not required to take any further action. The parts were not "perishable" and did not, when the dispute arose, "threaten to decline in value speedily." ICU is a dealer in microprocessors and would have been able to sell them far more readily than Johnson. Johnson is a manufacturer and assembler; it had no ready access to the seller's market for these components.

Had ICU accepted Johnson's timely attempts to return the parts and resold them, it would not have suffered any loss. Johnson cannot now be held responsible for ICU's unjustified refusal to mitigate damages.

### Conclusion

Johnson is ordered to pay ICU the sum of $4,638.73, with interest from August 15, 1984.

SO ORDERED.