**BRANDEIS MACHINERY & SUPPLY CO., LLC, Appellant–Plaintiff,**

v.

**CAPITOL CRANE RENTAL, INC., Appellee–Defendant.**

**No. 49A05–0107–CV–314.**

Court of Appeals of Indiana.

March 21, 2002.

---

Anthony W. Mommer, Libby Y. Mote, Krieg DeVault LLP, Indianapolis, IN, Attorneys for Appellant.

James E. Carlberg, George T. Patton, Jr., Steven D. Groth, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Brandeis Machinery & Supply Company (Brandeis) appeals the damage award granted by the trial court. In particular, Brandeis maintains that the trial court erred by failing to award the contract price and by failing to include service charges for late payment according to the terms of its contract with Capitol Crane Rental, Inc. (Capitol). Because we find that the evidence supports the trial court's damage calculation, we affirm.

### Facts and Procedural History

Brandeis and Capitol entered into a Lease Agreement on June 16, 1998. Under the lease, Capitol rented a 35–ton Grove Model RT635C Rough Terrain Crane (Crane) from Brandeis for six months. The lease included an option for Capitol to buy the Crane. When the first six months of the lease expired, Capitol continued to rent the Crane for another six-month period on a month-to-month basis.

Brandeis' lead salesman, Greg Henry, and Capitol's owner, Steve Dotlich, executed a Cash Sales Contract (Contract) on June 16, 1999. Under the Contract, Capitol agreed to buy the Crane "as is-where is" for $291,773.46. The Contract included the following provision:

TERMS OF PAYMENT: Net 10 days from invoice date . . . .

If not paid on due date, 2% per month service charge will be applied.

Appellant's App. p. 39. Brandeis' CEO signed the Contract to acknowledge approval of the deal on June 22, 1999. Brandeis sent Capitol the invoice for the Crane on June 29, 1999.

In late June of 1999, Maxim Crane Works (Maxim), a national crane rental company, approached Dotlich about buying Capitol. After Maxim asked to buy Capitol, Dotlich returned the Crane to the Brandeis lot. About one week after Dotlich had returned the Crane, Henry, who had dealt with Dotlich regarding the lease and the Contract, called Dotlich to inquire about the returned Crane. During their telephone conversation, Dotlich informed Henry that he "did not want to buy [the Crane] any more." Appellant's App. p. 121. Dotlich also told Henry that he was selling his business.

When Brandeis discovered that Dotlich had returned the Crane, the Brandeis managers told Henry and the sales staff not to sell the Crane because it belonged to Capitol and not to Brandeis. Additionally, Brandeis marked the Crane with chalk to indicate that the Crane was the property of Capitol and had already been sold to Capitol.

Before returning the Crane, Capitol repaired damage to the Crane. Dotlich testified that the Crane's boom had been damaged around the time that he signed the Contract, but he could not recall if the damage occurred before or after he signed the Contract. Capitol bought parts from Brandeis and repaired the Crane.

After Capitol returned the Crane to Brandeis, Brandeis expended $9,794.86 to inspect the repairs made to the boom. Walter Ross, Brandeis' Indianapolis Branch Manager, testified that the Crane was inspected because he understood that

Brandeis had reached "some kind of resolution" with Capitol that Brandeis would prepare to resell the Crane. Tr. p. 22. He testified that the inspection of the Crane was performed for the express purpose of selling the Crane to someone else.

At trial, Henry testified regarding Brandeis' customary business practices. Henry stated that he was aware of more than one instance when a customer had signed a contract with Brandeis, but decided to cancel the contract before any money had changed hands. In these cases, Brandeis cancelled the contracts and did not try to enforce the sales. Henry explained that the reason for this practice was to avoid upsetting and losing customers. Additionally, Henry testified that when dealing with Capitol and generally with all of Brandeis' customers, a transaction was only considered final when payment was made.

Following the trial, each side submitted post-trial briefs. In its brief, Brandeis contended that the appropriate damage award would include the purchase price of the Crane, which was $291,773.46 plus interest at the rate of 2% per month for late payment as provided for in the Contract. As of May 31, 2001, $159,302.38 had accumulated in late payment interest. Furthermore, Brandeis calculated the damage award to include the inspection fee of the Crane due to the damage sustained and repairs performed while in Capitol's care as an incidental cost. The costs for the inspection of the repairs were $9,794.86. Based on these numbers, Brandeis prayed for a damage award totalling $460,870.70.

In its brief, Capitol maintained that no damages should have been awarded. In the alternative, Capitol submitted that damages should be calculated by subtracting the fair market value of the Crane from the Contract price of $291,773.46. Regarding the fair market value of the

Crane, Henry testified that based on rates of depreciation the Crane's fair market value in June/July 1999 was between $270,000 and $275,000. Due to the difference, Capitol suggested using the median value of $272,500. The difference between the median fair market value of $272,500 and the Contract price of $291,773.46 is a damage award of $19,273.46.

The trial court entered judgment in favor of Brandeis on June 21, 2001. The trial court ordered that "Brandeis Machinery & Supply Co., LLC, recover of and from the defendant, Capitol Crane Rentals, Inc., the sum of $29,067.00 with interest thereon from the date of judgment, as provided by law, plus costs of this action." Appellant's App. p. 5. This appeal ensued.

## Discussion and Decision

Brandeis asserts that the trial court erred in calculating the damage award. First, Brandeis contends that the trial court erred by failing to award the full Contract price when calculating the damages. Second, Brandeis argues that the trial court erred by failing to include service charges for the late payment as dictated by the terms of the Contract in the damage calculation. We address each contention in turn.

In this case, neither party requested special findings of fact and the trial court did not enter any. When the trial court enters a general judgment without special findings and conclusions, we may not reweigh evidence or consider witness credibility but must affirm if sustainable on any legal theory. *Perdue Farms, Inc. v. Pryor*, 683 N.E.2d 239, 240 (Ind. 1997); *Willie's Constr. Co., Inc. v. Baker*, 596 N.E.2d 958, 961 (Ind.Ct.App.1992), *trans. denied.* In reviewing a general judgment, we must presume that the trial court correctly followed the law. *Perdue,* 683 N.E.2d at 240. Additionally, due re-

gard must be given the trial court's opportunity to judge the credibility of witnesses, and the judgment should not be set aside unless clearly erroneous. *Id.* at 241. Moreover, generally the computation of damages is a matter within the sound discretion of the trial court. *Marathon Oil Co. v. Collins,* 744 N.E.2d 474, 481 (Ind.Ct. App.2001). A damage award will not be reversed upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* In determining whether the award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.*

### I. The Contract Price

Brandeis asserts that the trial court erred by failing to include the full Contract price in the damage award. Specifically, Brandeis maintains that the damage award should have included the full Contract price of $291,773.46 because Capitol accepted the Crane before returning it, thereby justifying an action for the price under Indiana Code § 26–1–2–709. In addition, Brandeis contends that it was not obligated to hold the Crane for Capitol, it did not have a duty to resell the Crane, and the fact that Capitol was bought out by another business should not effect its right to recover the price of the Crane.

Conversely, Capitol asserts that the evidence supports the trial court's damage award. In particular, Capitol contends it did not accept the Crane; therefore, the trial court did not err by awarding Brandeis the difference between the Contract price and the fair market value of the Crane rather than the full Contract price.

■ Initially, we note that the Uniform Commercial Code (U.C.C.) does not provide a great deal of guidance as to when a particular damage remedy is appropriate. *R.E. Davis Chem. Corp. v. Diasonics, Inc.,* 826 F.2d 678, 681 (7th Cir.1987).[1] However, one of the broad remedial goals of the U.C.C. is that the aggrieved party be put in as good a position as if the other party had fully performed, but not in a better position. *Commonwealth Edison Co. v. Decker Coal Co.,* 653 F.Supp. 841, 844 (N.D.Ill.1987).

Keeping this in mind, we turn to Indiana Code § 26–1–2–709(1)(a), which provides the guidelines under which an action for the price may be maintained. It states that:

> (1) When the buyer fails to pay the price as it becomes due, the seller may recover, together with any incidental damages under IC 26–1–2–710, the price:
>
> > (a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer....

Ind.Code § 26–1–2–709(1)(a).

■ An action for the price is sustainable only if the buyer has accepted the goods.[2] Acceptance is defined under the Indiana Code as "failure to make an effective rejection." Ind.Code § 26–1–2–606. A rejection of goods must be made "within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Ind.Code § 26–1–2–602(1). Therefore, an action for

---

**1.** Because no previous Indiana cases have dealt with this precise issue, we look to the case law of other states with identical U.C.C. provisions. *Woodruff v. Clark County Farm Bureau Co-op. Ass'n,* 153 Ind.App. 31, 286 N.E.2d 188, 194 (1972).

**2.** We note that Indiana Code § 26–1–2–709 also allows an action for the price when the goods are lost, damaged, or non-resalable. However, none of these situations apply in this case. Accordingly, we do not examine them.

the price is a remedy for an ineffective rejection under Indiana Code § 26–1–2–602(1). *See Integrated Circuits Unlimited, Inc. v. E.F. Johnson Co.*, 691 F.Supp. 630, 633 (E.D.N.Y.1988), *overruled on other grounds*, 875 F.2d 1040 (2d Cir.1989).

 Rejection of goods by the buyer may be effective, but nonetheless wrongful. A wrongful rejection is a rejection of a conforming tender. *See Integrated Circuits Unlimited, Inc.*, 875 F.2d at 1042. Put differently, a rejection may be timely made and thus, effective, but wrongful in that conforming goods are rejected.

██ Damages for a wrongful rejection substantially differ from damages for an ineffective rejection. Indiana Code § 26–1–2–709(3) provides that after a buyer has wrongfully rejected goods, a seller is not entitled to price but shall be awarded damages for nonacceptance under Indiana Code § 26–1–2–708. Damages for nonacceptance are defined by Indiana Code § 26–1–2–708 as:

> Subject to subsection (2) and to the provisions of IC 26–1–2–723 with respect to proof of market price, the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in IC 26–1–2–710, but less expenses saved in consequence of the buyer's breach.

Thus, damages for a wrongful rejection are limited to the difference between the market value of the goods and the unpaid contract price together with any incidental damages.

Where a buyer makes a procedurally effective, but substantively wrongful rejection, the seller is not entitled to the unpaid contract price but is limited to the damages specified in Indiana Code § 26–1–2–708. As one court has noted:

> [A] wrongful rejection may still be an effective rejection, and does not in itself entitle the seller to the price. Since an ineffective rejection constitutes an acceptance, by negative inference any effective rejection—whether or not it is justified—bars acceptance and protects the buyer from § 2–709 damages. Subsection (3) of § 2–602 ... provides that the remedies in cases of wrongful rejection are contained in § 2–703, entitled "Seller's Remedies in General." Subsection (e) of § 2–703 states that the measure of damages for goods wrongfully rejected is the difference between the contract price and the market price (§ 2–708) or "in the proper case the price" under § 2–709. Thus, a seller whose goods have been wrongfully rejected will be entitled to the price only if that measure of damages is "proper" under § 2–709 because the rejection was also procedurally ineffective.

*Integrated Circuits Unlimited, Inc.*, 691 F.Supp. at 633.

Legal scholars acknowledge the difference between an effective and wrongful rejection and the remedies available for each:

> All commentators agree that the Code drafters contemplated effective rejections which might be substantively wrongful and intended that all such rejections forestall acceptance without regard to their substantive wrongfulness.... It is important to distinguish between "wrongful" rejections and "ineffective" rejections. As we use the term (and as we believe the drafters intended the term to be used), a rejection of a conforming tender would be a wrongful rejection ... and would so preclude his acceptance of the goods and foreclose a

consequent liability for the price under 2–709(1)(a).

*Id.* (quoting J. White & R. Summers, Uniform Commercial Code, 258, 314 (2d ed.1980) (footnotes omitted)).

■ Turning to our case, we are reminded that we may not reweigh the evidence and must sustain the trial court on any legal theory. *Perdue Farms, Inc.*, 683 N.E.2d at 240; *Willie's Constr. Co., Inc.*, 596 N.E.2d at 961. Given our standard of review, the trial court could have concluded that Capitol made a wrongful, but effective rejection of the Crane. Capitol's rejection was wrongful because it was not based on any non-conformity. The trial court could, however, have concluded that Capitol made an effective rejection by meeting the requirements of Indiana Code § 26–1–2–602. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Ind.Code § 26–1–2–602(1). "The giving of seasonable notice is to permit the seller to take protective action such as withdrawing the goods, proposing a cure, or beginning negotiations to settle the dispute." *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 551 (Ind.Ct.App.1987), *reh'g denied*, (citing 3 W. Hawkland, Uniform Commercial Code Series § 2–602:02 (1984 & Supp.1987)). What constitutes a reasonable time for notification of rejection is dependent upon the nature, purpose, and circumstances of the situation. *McClure*, 515 N.E.2d at 551.

■ In this case, the trial court could have justifiably concluded that Capitol returned the Crane within a reasonable time and provided seasonable notification of its rejection of the Crane. As to the timing of the return, Capitol's owner, Dotlich, testified that shortly after the contract was signed in June of 1999, he returned the Crane to Brandeis' lot and told an employee of Brandeis that he no longer wanted to buy it. Furthermore, Brandeis had a pattern of canceling contracts in the past after customers had signed them, but before money had changed hands. Specifically with regard to Capitol, Brandeis' lead salesman, Greg Henry, admitted that a transaction was considered final only when payment was made.

Moreover, it is not clear from the record whether Capitol received the invoice from Brandeis regarding the sale of the Crane before Capitol returned the Crane. In particular, Brandeis sent the invoice for the Crane to Capitol on June 29, 1999. However, Dotlich testified that he returned the Crane after Maxim approached him about buying Capitol in late June. Therefore, the trial court could have concluded that the return was timely because Capitol did not receive the invoice before returning the Crane. Furthermore, the evidence presented showed that after the return of the Crane, Brandeis inspected the Crane in preparation of reselling it to another buyer. Based on this evidence, the trial court could have concluded that Capitol provided seasonable notification of the rejection. Thus, we conclude that the trial court did not err in finding that Capitol returned the Crane in a reasonable time.

Because the trial court could have concluded that Capitol made a wrongful, yet effective rejection, Brandeis' action for the price must fail. Instead, the appropriate calculation of damages is the difference between the contract price and the market price at the time of delivery plus incidental damages. Ind.Code § 26–1–2–709(3); Ind. Code § 26–1–2–708. Therefore, we find that the trial court did not err when it declined to include the Contract price in the damage award.

By calculating the difference between the contract price and the market price,

Brandeis would receive $19,273.46. The trial court awarded Brandeis the sum of $29,067. By examining the post-trial briefs filed by the parties which outlined their individual damage calculations, we can infer that the trial court's damage award includes the difference between the Contract price and the fair market value of the Crane which is $19,273.46 and the cost of the inspection of the repairs which cost $9,794.86.

In conclusion, because the trial court could have concluded that Capitol wrongfully, but effectively rejected the Crane, the evidence supports the trial court's damage award. Due to the fact that this analysis disposes of Brandeis' action for the price, we do not reach the other arguments raised by Brandeis.

### II. The Service Charges

 Next, Brandeis argues that the trial court erred by not including the service charges for late payment in the damage award. Brandeis points to the fact that the Contract stated, "If not paid on due date, 2% per month service charge will be applied." Appellant's App. p. 39. Walter Orrill, Brandeis' Credit Manager, testified that he calculated the late charges under the Contract to be $159,302.38.

Because the trial court found that Capitol rejected the Crane, Brandeis is limited to recover damages for nonacceptance. Indiana Code § 26–1–2–708 provides that "the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in IC 26–1–2–710 ...." Seller's incidental damages "include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of the goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." Ind.Code § 26–1–2–710. Based on this definition, it was reasonable for the trial court to conclude that the service charge as provided for in the Contract does not fit within the Section 26–1–2–710 definition of incidental damages. Therefore, the trial court did not err by excluding the service charge.

Judgment affirmed.

FRIEDLANDER, J., and BARNES, J., concur.