In re the GUARDIANSHIP OF Patrick ATKINS, Adult.

Brett Conrad, Appellant–Petitioner,

v.

Thomas Atkins and Jeanne Atkins, Appellees–Cross–Petitioners.

No. 29A02–0606–CV–471.

Court of Appeals of Indiana.

June 27, 2007.

---

Jeffrey S. Dible, Maggie L. Smith, Lucy R. Dollens, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellant.

David S. Richey, Kent M. Frandsen, Parr Richey Obremskey & Morton, Lebanon, IN, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

Appellant-petitioner Brett Conrad[1] appeals from the trial court's order that, among other things, appointed appellees-cross-petitioners Thomas and Jeanne Atkins (collectively, the Atkinses) as co-guardians of Patrick Atkins and Patrick's estate. Specifically, Brett raises the following arguments: (1) Brett should have been appointed as Patrick's guardian or, at a minimum, should have visitation rights; (2) the trial court erred by declining to require Patrick's physical attendance at trial and refusing to interview or meet with Patrick; (3) Patrick's Charles Schwab account should not have been entirely set off to the guardianship estate; and (4) a portion of Brett's attorney fees and expenses should have been paid from the guardianship estate.

We find, among other things, that although the trial court did not abuse its discretion by naming the Atkinses to be Patrick's co-guardians, there is overwhelming evidence in the record establishing that it is in Patrick's best interest to continue to have contact with Brett, his life partner of twenty-five years. We also find that the trial court erroneously refused Brett's request to have a portion of his attorney fees and costs paid by the guardianship estate. Thus, we affirm in part, reverse in part, and remand with instructions to grant Brett the visitation and contact with Patrick that he requested and to calculate the amount of Brett's attorney fees and costs to be paid by the guardianship estate.

## FACTS

Patrick and Brett met and became romantically involved beginning in 1978 when they attended Wabash College together. Since that time—for twenty-five years—the men have lived together and have been in a committed and loving relationship.

Patrick's family vehemently disapproves of his relationship with Brett. Patrick, however, was able to reconcile his religious faith with his homosexuality and in 2000, Patrick wrote a letter to his family, begging them to accept him and welcome Brett:

> I want you all to know that Brett is my best friend in the whole world and I love him more than life itself. I beg all of you to reach out to him with the same love you have for me, he is extremely

---

1. On June 9, 2006, Brett filed a motion to permit identification of the parties by their initials. The motions panel directed the parties to use full names in their pleadings and reserved the ruling on Brett's motion for the writing panel. Brett has offered no citation to authority or rule in support of his request to identify the parties herein by their initials and we see no compelling reason to grant this request. Consequently, the motion is denied.

special and once you know him you will understand why I love him so much. Trust me, God loves us all so very much, and I know he approves of the love that Brett and I have shared for over 20 years.

Appellant's App. p. 569.

Patrick's family, however, has steadfastly refused to accept their son's lifestyle. Jeanne believes that homosexuality is a grievous sin and that Brett and his relatives are "sinners" and are "evil" for accepting Brett and Patrick's relationship. *Id.* at 42, 45, 274. She testified that no amount of evidence could convince her that Patrick and Brett were happy together or that they had a positive and beneficial relationship.

Neither Patrick nor Brett earned a degree from Wabash College. In 1982, Patrick began working for the family business, Atkins, Inc. d/b/a Atkins Elegant Desserts and Atkins Cheesecake, and he ultimately became the CEO of that business. Patrick's annual income prior to his incapacitation was approximately $130,000. Brett is a waiter, has been working for Puccini's restaurants for the past ten years, and has an annual income of approximately $31,800. Patrick and Brett pooled their earnings, depositing them into a checking account that was titled solely in Patrick's name but was used as a joint account for payment of living expenses. They used some of their accumulated savings to make extra mortgage payments and periodically transferred the remaining savings into a Charles Schwab account that was titled solely in Patrick's name.

Between 1980 and 1992, Brett and Patrick lived together in various apartments. In 1992, they bought a house together in Fishers as joint tenants, and the home is still titled jointly.

On March 11, 2005, Patrick was on a business trip in Atlanta when he collapsed and was admitted to a hospital. Doctors determined that he had suffered a ruptured aneurysm and an acute subarachnoid hemorrhage. Patrick remained in the Intensive Care Unit (ICU) of the Atlanta hospital for six weeks. At some point during his stay in the ICU, Patrick suffered a stroke.

Brett traveled to the Atlanta hospital to be with Patrick; Patrick's family did as well. Patrick's brother testified that Brett's mere presence in the hospital was "hurting" Jeanne and offending her religious beliefs. Jeanne told Brett that if Patrick was going to return to his life with Brett after recovering from the stroke, she would prefer that he not recover at all. Appellant's App. p. 285.

Shortly after Brett's first visit with Patrick in the ICU, Patrick's family restricted the times and duration of Brett's visits. Subsequently, Brett was allowed to see Patrick for only fifteen minutes at a time after the close of regular visiting hours so that Patrick's family would not have to see Brett at all. Eventually, a sign was placed in Patrick's ICU space reading "immediate family and clergy only," purporting to exclude Brett altogether. *Id.* at 180–81. Nevertheless, hospital staff defied the family's instructions and allowed Brett to continue to visit with Patrick early in the morning and in the evenings, outside of regular visiting hours.

On April 27, 2005, Patrick was moved from the Atlanta hospital to ManorCare at Summer Trace (Summer Trace), a nursing facility in Carmel. In May and June 2005, Brett visited Patrick daily at Summer Trace, with his visits usually taking place after regular visiting hours so that Patrick's relatives would not see him. Brett was well-received by the Summer Trace staff, who observed that his visits had a positive impact on Patrick's recovery.

On June 20, 2005, Brett filed a guardianship petition, requesting that he be appointed guardian of Patrick's person and property. The Atkinses filed an answer to the petition, a motion to intervene, and a cross-petition requesting that they be appointed co-guardians of Patrick's person and property. Brett eventually voluntarily withdrew his request to be appointed guardian of Patrick's property, seeking only to be named as guardian of Patrick's person.

In mid-August 2005, Patrick was admitted to Zionsville Meadows, another nursing facility, for physical rehabilitation and speech therapy. Brett continued to visit Patrick after regular visiting hours at Zionsville Meadows. Notwithstanding the conclusions of the court-appointed guardian ad litem (GAL) and a neuropsychologist that it would be beneficial to Patrick and his recovery process for Brett to continue to have contact with Patrick, in early November 2005, the Atkinses moved Patrick into their home and have refused to allow Brett to visit with Patrick since that time. The Atkinses have refused phone calls from Brett and requests from Brett and his family members to visit Patrick.[2]

At the time of trial, Patrick was able to walk, dress, bathe, and feed himself with some supervision or prompting, to read printed matter aloud with good accuracy but only 25% comprehension, to engage in simple conversations, to communicate his basic wants and needs, and to answer questions with some prompting. He still required close and constant supervision and had significant problems with short-term memory, attention span, problem-solving, multi-step commands, reacting in urgent situations, and decision-making.

The Atkinses took turns supervising or caring for Patrick in their Carmel home and were assisted by a certified home health aide who worked with Patrick daily from 8:30 a.m. until 5:00 p.m.

A trial was held beginning on November 23, 2005. On that same day, Brett filed a motion seeking the payment of a portion of his attorney fees and costs from the guardianship estate.

On January 11, 2006, Brett filed a petition for an order requiring the Atkinses to allow him to visit and have contact with Patrick. At trial, the Atkinses acknowledged that it was "probably true" that if the trial court did not order them to allow visitation between Patrick and Brett, they would not allow any contact between the life partners. Appellant's App. p. 301–02.

On May 10, 2006, the trial court entered two orders, making very limited findings of fact and disposing of the case by:

- Appointing the Atkinses as co-guardians of Patrick's person and estate;
- Denying Brett's visitation petition and ordering that "it is and shall be the ultimate and sole responsibility of [the Atkinses] to determine and control visitation with and access of visitors to Patrick Atkins in his best interest";
- Denying Brett's attorney fee petition;
- Determining that the home owned by Patrick and Brett should be split equally between Brett and the guardianship estate after reimbursing the estate for mortgage payments, taxes, insurance, utilities, and maintenance expenses incurred after March 10, 2005, and permitting the Atkinses to

**2.** Brett's relatives accepted Brett and Patrick's relationship and consider Patrick to be a member of their family. Therefore, they have also suffered a loss stemming from Patrick's incapacitation and the Atkinses' refusal to allow Brett or any members of his family from talking with or visiting Patrick.

maintain the real estate, to sever and sell it, or to bring an action for partition;

- Ordering that $16,469.73—approximately one-third of the balance in Patrick's checking account—be disbursed to Brett as the portion attributable to his earnings and contributions, with the rest to be set off to the guardianship estate;
- Ordering that the funds in the Charles Schwab account be set off to the guardianship estate;
- Ordering that the household goods and other tangible property be split equally between Brett and the guardianship estate; and
- Ordering Patrick's interest as a shareholder in the family business to be set off to the family estate.

*Id.* at 12–14. Brett now appeals.

## DISCUSSION AND DECISION

■ As we consider Brett's challenges to the trial court's judgment, we observe that the trial court is vested with discretion in making determinations as to the guardianship of an incapacitated person. *See* Ind.Code § 29-3-2-4. This discretion extends to both its findings and its order. *Id.* Thus, we apply the abuse of discretion standard to review the trial court's findings and order. *In re Guardianship of V.S.D.*, 660 N.E.2d 1064, 1066 (Ind.Ct.App. 1996). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances presented. *J.M. v. N.M.*, 844 N.E.2d 590, 602 (Ind.Ct.App.2006), *trans. denied.*

### I. Guardianship

■ Brett first argues that the trial court erroneously appointed the Atkinses as Patrick's guardian. A guardianship action is initiated by filing a petition seeking appointment to serve as guardian of an incapacitated person. *See* I.C. § 29-3-5-1. The guardianship statutes provide that the following

are entitled to consideration for appointment as a guardian ... in the order listed:

(1) a person designated in a durable power of attorney;

(2) the spouse of an incapacitated person;

(3) an adult child of an incapacitated person;

(4) a parent of an incapacitated person, or a person nominated by will of a deceased parent of an incapacitated person ...;

(5) any person related to an incapacitated person by blood or marriage with whom the incapacitated person has resided for more than six (6) months before the filing of the petition;

(6) a person nominated by the incapacitated person who is caring for or paying for the care of the incapacitated person.

I.C. § 29-3-5-5(a). With respect to persons having equal priority, however, "the court shall select the person it considers best qualified to serve as guardian." *Id.* at § –5(b). Additionally, the trial court is authorized to "pass over a person having priority and appoint a person having a lower priority or no priority" if the trial court believes that action to be in the incapacitated person's best interest. *Id.* The trial court's paramount consideration in making its determination of the person to be appointed guardian is "the best interest of the incapacitated person." *Id.*

Patrick did not designate Brett for guardianship consideration in a durable power of attorney. Therefore, only if the trial court concluded that it was in Patrick's best interest that Brett be appointed

his guardian would his appointment have been proper. Brett makes a sincere and compelling argument that, based on his long-term relationship with Patrick and his heartfelt desire to take care of his life partner, "Patrick's best interest will be served by appointing Brett as guardian over Patrick's person." Appellant's Br. at 22. Under these circumstances, however, our standard of review does not permit us to conduct a de novo analysis of what is in Patrick's best interest. Instead, we must assess whether the trial court abused its discretion when it found that it was in Patrick's best interest that the Atkinses be appointed co-guardians of his person and estate.

The evidence presented established that the Atkinses' home was appropriate for Patrick's care. The Atkinses were actively involved in Patrick's care from the time of his hospitalization in Atlanta until his release to their care, and they have adequately cared for Patrick in their home since November 2005. Other family members are willing and able to assist with Patrick's care as might be necessary in the future. The Atkinses were committed to providing Patrick with the best possible care by applying their own personal efforts, employing outside assistance, and pursing potentially helpful therapies.

We conclude that there is sufficient evidence in the record supporting a conclusion that the Atkinses and Brett are equally well-equipped to care for Patrick's physical needs. Given the Atkinses' lack of support of their son's personal life through the years and given his mother's astonishing statement that she would rather that he *never recover* than see him return to his relationship with Brett, we are extraordinarily skeptical that the Atkinses are able to take care of Patrick's emotional needs. Appellant's App. p. 285. But we cannot conclude that the record

shows that the trial court abused its discretion in denying Brett's guardianship petition. Under these circumstances, therefore, the trial court had two passable options from which to choose, neither of which was presumptively incorrect. Based upon the evidence presented, the trial court did not abuse its discretion when it found that it was in Patrick's best interest to appoint the Atkinses as co-guardians of his person.

## II. Visitation

■ Brett next argues that the trial court erroneously denied his request for visitation and telephonic contact with Patrick. Turning to the record herein, we note that after observing interactions between Brett and Patrick and between Patrick and his family, the GAL concluded, among other things, as follows:

... It also seems evident that Patrick loves Brett very much and it is evident that Brett loves Patrick.

The challenge in this case seems to be how to provide for all parties to coexist in the best interest of Patrick. It appears that the involvement of *all parties* is paramount to Patrick's continued improvement....

\* \* \*

... [T]his Guardian Ad Litem strongly believes that an order should be implemented ensuring that *all parties* have regular access to Patrick regardless of who is appointed guardian. All parties to this litigation appear to be truly committed to Patrick's best interest and have no ulterior motives that this Guardian Ad Litem can determine.

Appellant's App. p. 58–60 (emphases added). The GAL later testified that "cutting back on one of those sources of stimulation or one of those sources of familiarity would

just seem to me not to be in Patrick's best interest." *Id.* at 768.

An impartial neuropsychologist who evaluated Patrick testified that people in his profession treating someone with memory problems, such as Patrick, strive to have as many "familiar cues" as possible for the patient "to help try to trigger access to long-term memory as well as to facilitate or try and promote his learning or recognition of new information." *Id.* at 236. The neuropsychologist went on to testify as follows:

A. [A]ssuming that there was a long relationship [between Brett and Patrick] and assuming that ... that relationship was a significant relationship emotionally and in time it would ordinarily be our objective to reintegrate the patient into that environment so that they can participate in activities and situations with which they're familiar.

Q. Based on your examination and evaluation of Patrick do you have a professional opinion as a neuropsychologist within a reasonable certainty about whether it is appropriate in terms of Patrick's long-term care and rehabilitation and recovery for Patrick's parents to have him continue to live in their home and to prohibit visits from or with Brett?

A. Well, my experience in interacting with the patient and his family were that it seemed that [the Atkinses] were indeed generally interested in his care and were very invested in it. I think, however, that if this relationship [between Brett and Patrick] has persisted as long as you describe that *including Brett in that situation would be at least from a clinical standpoint something that we would recommend.*

\* \* \*

Q. Based on what you know and your, of Patrick's background, his family situation, his history, and also on your examination and evaluations of Patrick, do you believe as his neuropsychologist within a reasonable certainty that it would be detrimental to Patrick's health or recovery if he were to see Brett or spend time with Brett outside Patrick's parents' home?

A. I have no reason to believe that it would be detrimental. *I suspect it would be helpful.*

*Id.* at 236–39 (emphases added).

Although the Atkinses argue that there was evidence that "visitation with Brett poses a risk of diminishing Patrick's chance for normalcy of life and possibly causing irreparable psychological harm," appellees' br. p. 14, they provide no citation in support of this assertion and, indeed, the overwhelming evidence in the record supports a contrary conclusion. The only evidentiary support to which the Atkinses direct our attention in support of their position that Brett should be barred from visiting Patrick is testimony from their expert witness, psychologist Dr. Jonathon Mangold. Dr. Mangold met with Patrick only once for one hour, performed no psychological testing on Patrick, never spoke with Brett, and never observed Patrick and Brett together. On January 10, 2006, Dr. Mangold testified that he did not have enough factual background to form an opinion as to whether visitation with Brett would be harmful to Patrick. *Id.* at 630. Three weeks later, at trial, Dr. Mangold suddenly testified that he *could* give an opinion regarding visitation, opining that visitation with Brett may not be positive for Patrick from a psychological standpoint. *Id.* at 400–03, 626–31, 636–37. He reached this new conclusion based solely upon second-hand information that he obtained in interviews with Patrick's family members. *Id.* at 403–08.

Thus, the *sole* support of the trial court's conclusion that Brett should be barred from visiting Patrick consists of the changed opinion of the Atkinses' expert witness who based his opinion *not* on testing of Patrick, an interview of Brett, or observations of the two men interacting, but on secondhand information gleaned from Patrick's family members. Indeed, the overwhelming wealth of evidence in the record, as well as common sense, establishes that it is in Patrick's best interest that he continue to have contact with Brett, his life partner of over twenty-five years. We cannot conclude, therefore, that the evidence in the record supports the trial court's order denying Brett's request for visitation.[3]

The trial court was required to enter orders to "encourage development of the incapacitated person's self-improvement, self-reliance, and independence" and to "contribute to the incapacitated person's living as normal a life as that person's condition and circumstances permit without psychological or physical harm to the incapacitated person." I.C. § 29–3–5–3(b). The trial court was also required to order appropriate relief if it found that the Atkinses were not acting in Patrick's best interest. Ind.Code § 16–36–1–8(d). Given that the evidence overwhelmingly establishes that it is in Patrick's best interest to spend time with Brett and that the Atkinses have made it crystal clear that, absent a court order requiring to do so, they will not permit Brett to see their son, it was incumbent upon the trial court to order visitation as requested by Brett. Consequently, we reverse the judgment of the trial court on this basis and direct it to amend its order to grant Brett visitation and contact with Patrick as Brett requested.

### III. Patrick's Presence at the Hearing

■ Brett next argues that the trial court erroneously declined to require Patrick's presence at the hearing. Indiana Code section 29–3–5–1(d) provides as follows:

(d) *A person alleged to be an incapacitated person must be present at the hearing* on the issues raised by the petition and any response to the petition unless the court determines by evidence that:

(1) it is impossible or impractical for the alleged incapacitated person to be present due to the alleged incapacitated person's disappearance, absence from the state, or similar circumstance;

(2) it is not in the alleged incapacitated person's best interest to be present because of a threat to the health or safety of the alleged incapacitated person as determined by the court;

(3) the incapacitated person has knowingly and voluntarily consented to the appointment of a guardian or the issuance of a protective order and at the time of such consent the incapacitated person was not incapacitated as a result of a mental condition that would prevent that person from knowingly and voluntarily consenting; or

(4) the incapacitated person has knowingly and voluntarily waived notice of the hearing and at the time of such waiver the incapacitated person was not incapacitated as a result of a mental condition that would prevent that person from making a knowing and voluntary waiver of notice.

---

**3.** To the extent that the Atkinses complain about the hours at which Brett visited Patrick in various medical facilities, we note that he did so only because the Atkinses barred him from visiting during business hours.

(Emphasis added). Likewise, Hamilton County Local Probate Rules require that "[i]n all guardianship matters seeking to declare an adult incapacitated for any reason, the incapacitated person *shall* be present at the hearing or sufficient evidence shall be presented showing that the incapacitated person is unable to appear." Hamilton County Local Rule 714.10 (emphasis added).

None of the exceptions to the rules mandating Patrick's presence are at issue herein, nor was there evidence presented that Patrick was unable to appear. Although there was evidence in the record establishing that Patrick was incompetent to *testify*, there is absolutely no evidence that his mere presence at the hearing would have endangered his health or safety. The trial court, therefore, erroneously declined to require Patrick's presence at the hearing.

█ That said, however, the right to be present at the guardianship hearing is akin to a due process right belonging to the allegedly incapacitated person. Here, therefore, it was *Patrick's* right to be present at the hearing; neither Brett nor the Atkinses have standing to enforce that right. It was the duty of Patrick's court-appointed GAL to represent Patrick's interest and insist that he be present at the hearing. The GAL did not do so. Consequently, this right has been waived and we decline to remand for a new trial on this basis.

### IV. Charles Schwab Account

█ Brett next argues that the trial court erred when it set off the entire $85,000 Charles Schwab account in Patrick's name to the guardianship estate. The trial court determined that Brett was entitled to approximately one-third of the balance in the checking account that was solely in Patrick's name, having found the one-third "portion ... attributable to Brett's earnings and contributions" to the checking account. Appellant's App. p. 13. Brett emphasizes that the evidence indicated that the Charles Schwab account was funded by checks written from Patrick's checking account. Therefore, Brett insists that one-third of the Charles Schwab account should also be found to be attributable to his earnings and contributions.

According to the evidence presented, at the time of his aneurysm, Patrick's annual salary was approximately $130,000. Appellant's App. p. 608. Brett's 2004 tax return showed that Brett earned about $31,800 annually. *Id.* at 297–98, 319–21, 644. Patrick's earnings, therefore, were more than four times greater than Brett's. Brett testified that he had deposited most of his earnings into the checking account. But Brett also testified that all of Patrick's earnings had been deposited into that account as well. Thus, by awarding Brett one-third of the checking account, the trial court gave Brett a greater portion of the account than would be attributable to him had he deposited all of his earnings into it. We also observe that the checking account and Charles Schwab account were titled solely in Patrick's name.[4] Under these circumstances, we cannot conclude that the

4. The Atkinses urge us to consider the fact that Brett received half of the equity in the parties' jointly-owned home as we analyze the proper recipient of the Charles Schwab account. But Brett and Patrick do, in fact, own the home as joint tenants. Consequently, Brett is entitled to half of that equity regardless of his contribution to mortgage payments and it would have been erroneous for the trial court to have awarded less than half of the home's value to Brett. *See Cunningham v. Hastings*, 556 N.E.2d 12, 13–14 (Ind.Ct.App. 1990) (holding that "[r]egardless of who provided the money to purchase the land, the creation of a joint tenancy relationship entitles each party to an equal share of the pro-

trial court abused its discretion by ordering that Patrick's Charles Schwab account be set aside to the guardianship estate.

### V. Attorney Fees and Costs

■ Finally, Brett argues that the trial court erroneously refused to order that a portion of his attorney fees and costs be reimbursed from the guardianship estate. Indiana Code section 29–3–4–4 requires that "any . . . attorney . . . whose services are provided in good faith and are beneficial to the protected person . . . is entitled to reasonable compensation and reimbursement for reasonable expenditures on behalf of the protected person." This statute requires only that the attorney's services be provided in good faith and be beneficial to the protected person. There is no evidence in the record here that Brett has not acted in good faith, nor is there evidence that this dispute between these parties, all of whom love and want the best for Patrick, has been anything but beneficial for Patrick's care. Additionally, we emphasize that the trial court explicitly found Brett's attorney fees and costs to be reasonable. Appellant's App. p. 12. Consequently, it was erroneous for the trial court to deny Brett's request that the guardianship estate reimburse a portion of his attorney fees and we remand for a calculation of the amount to be reimbursed.

### VI. CONCLUSION

We are confronted here with the heartbreaking fracture of a family. Brett and Patrick have spent twenty-five years together as life partners—longer than Patrick lived at home with his parents—and their future life together has been destroyed by Patrick's tragic medical condition and by the Atkinses' unwillingness to accept their son's lifestyle.

Although we are compelled to affirm the trial court's order that the Atkinses be appointed Patrick's co-guardians under our standard of review, we reverse the trial court with respect to Brett's request for visitation, inasmuch as all credible evidence in the record establishes that it is in Patrick's best interest to continue to have contact with his life partner. We also find that the trial court should have required Patrick's presence at the hearing but that Patrick's GAL waived that right by failing to enforce it. Additionally, we conclude that the trial court properly set off the entirety of the Charles Schwab account to the guardianship estate. Finally, we find that the trial court erroneously refused Brett's request that the guardianship estate pay a portion of his attorney fees and costs and remand for a calculation of the amount to be paid therefrom.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to grant Brett visitation and contact with Patrick and to calculate the amount of Brett's attorney fees and costs to be paid by the guardianship estate.

ROBB, J., concurs.

DARDEN, J., dissents with opinion.

DARDEN, Judge, dissenting.

I would respectfully dissent from the majority's conclusion that the trial court erred when it did not enter an order granting Brett's request for his visitation and contact with Patrick.

I begin by summarizing the perspective from which we review the appeal of that

---

ceeds of the sale upon partition" and an equal right to share in the enjoyment of the real

estate while both joint tenants are alive).

decision. Neither party requested, and the trial court did not make *sua sponte,* findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A) with respect to Brett's motion seeking an order of visitation. "In the absence of special findings, we review a trial court decision as a general judgment and, without reweighing evidence or considering witness credibility, affirm if sustainable upon any theory consistent with the evidence." *Perdue Farms, Inc. v. Pryor,* 683 N.E.2d 239, 240 (Ind.1997); *see also Brandeis Machinery & Supply Co., LLC v. Capitol Crane Rental, Inc.,* 765 N.E.2d 173, 176 (Ind.Ct.App. 2002); *In re Estate of Highfill,* 839 N.E.2d 218, 224 (Ind.Ct.App.2005). Moreover, "due regard must be given the trial court's opportunity to judge the credibility of witnesses, and the judgment should not be set aside unless clearly erroneous." *Brandeis,* 765 N.E.2d at 176.

Further, as we have held, when reviewing the trial court's judgment in a guardianship proceeding, "we consider only the evidence most favorable to the prevailing party, and we neither reweigh the evidence nor reassess witness credibility." *Chavis v. Patton,* 683 N.E.2d 253, 255 (Ind.Ct.App.1997). I view the trial court's decision with respect to an order that the Atkinses, as co-guardians, allow Brett's visitation and contact with Patrick to be akin to that of a custody determination or modification. In such determinations, we also apply an abuse of discretion standard. We define such an abuse of discretion as occurring when the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Higginbotham v. Higginbotham,* 822 N.E.2d 609, 611 (Ind.Ct.App.2004); *Pawlik v. Pawlik,* 823 N.E.2d 328, 330 (Ind.Ct. App.2005); *Stratton v. Stratton,* 834 N.E.2d 1146, 1151 (Ind.Ct.App.2005). In the appeal of such determinations, we have repeatedly stated that we will not substitute our judgment for that of the trial court unless no evidence or legitimate inferences support its judgment, *id.,* and noted that "the trial court is in a better position than we are to render a decision ... because [it] can observe the parties' conduct and demeanor and listen to their testimony." *Pawlik,* 823 N.E.2d at 330, *Stratton,* 834 N.E.2d at 1151. *Id.* We have further emphasized that we will not reweigh the evidence, judge witness credibility, or substitute our judgment for that of the trial court. *Higginbotham,* 822 N.E.2d at 611, *Pawlik,* 823 N.E.2d at 330, *Stratton,* 834 N.E.2d at 1151; *see also In re Adoption of T.L. W.,* 835 N.E.2d 598, 600 (Ind.Ct.App.2005) (On appeal of order denying motion to enforce visitation, "we will not reweigh the evidence or substitute our judgment for that of the trial court.").

The majority concedes that Dr. Jonathon Mangold, a psychologist recognized by the majority as an expert, testified that he had personally met with Patrick, and that visitation with Brett might not be positive for Patrick from a psychological standpoint. Further, when Dr. Mangold opined that no visitation between Patrick and Brett should be ordered, he testified that he had reached this conclusion after having heard all of the testimony at trial. Therefore, the trial court's order denying the motion to order visitation was supported by evidence before it, and we should affirm. *See Perdue Farms, Inc.,* 683 N.E.2d at 240; *Higginbotham,* 822 N.E.2d at 611; *Pawlik,* 823 at 330; *Stratton,* 834 N.E.2d at 1151. When the majority concludes that "the overwhelming wealth of evidence in the record, as well as common sense" supports the determination that visitation should be ordered, Op. at 886, I believe that it has impermissibly substituted its judgment for that of the trial court. *Id.; T.L. W.,* 835 N.E.2d at 600.

I further note that the majority relies upon Indiana Code section 29–3–5–3(b) to declare that the trial court was required to enter orders to encourage development of Patrick's self-improvement, self reliance and independence, and to contribute to his living as normal a life as possible under the circumstances. Op. at 886. I can agree that such would indeed by a laudable goal of a guardianship order, but I cannot agree that this is what the statute requires. According to the statute,

> if it is alleged and *the court finds that the welfare of an incapacitated person would be best served by limiting the scope of the guardianship,* the court shall make the appointive or other orders under this chapter to
>
> (1) encourage development of the incapacitated person's self-improvement, self-reliance, and independence; and
>
> (2) contribute to the incapacitated person's living as normal a life as that persons condition and circumstances permit without psychological or physical harm to the incapacitated person.

I.C. § 29–3–5–3(b) (emphasis added). Here, the trial court did not find that Patrick's welfare would be best served by limiting the scope of the Atkinses' co-guardianship. The majority opinion necessarily implies such a finding by the trial court. To such a conclusion I would also respectfully dissent and suggest that the majority has impermissibly reweighed the evidence and assessed witness credibility in violation of our long accepted standard of review.