## Mary J. Winter, Appellant, *v.* Wm. J. Winter.

Argued April 30, 1931.

Before TREX-
LER, P. J., KELLER, LINN, GAWTHROP, CUNNINGHAM,
BALDRIGE and DREW, JJ.

*John F. Gloeckner,* and with him *Vernon Hazzard*
and *John R. O'Keefe,* for appellant.

*Crawford Scott,* for appellee.

OPINION BY TREXLER, P. J., July 8; 1931:

This is an action of divorce by the wife; charging
cruel and barbarous treatment and indignities to the
person. Both the judge who heard the case and the
court below refused the divorce, but after careful
analysis of the testimony submitted, the majority of

this court think it was error and that the libellant is entitled to a decree in her favor.

The libellant testified that the husband kicked her; that he was almost continuously under the influence of liquor; that he asked her for money and when refused, hit her with his fist, and knocked her down; at one time he came into the pantry to wash his hands and he knocked her against the window; another time as she was going down the cellar steps, he took his foot and kicked her so that she fell on her face on the cement floor of the cellar; on another occasion he came home drunk and started to fight with her, got very boisterous and said he was going to take an axe and cut up all the furniture and that he was going to chop her up. On that occasion she telephoned the police and he took her and knocked her flat on her back, broke her glasses and as she was lying on the floor, after calling her vile names, stated he wished she would die. She then had a warrant sworn out before a magistrate and she has not been well since that date. The justice made him pay the costs upon her stating that she was satisfied. Often he had choked her with both hands and knocked the breath out of her. When she would be working, he would come and grab her and squeeze her until she would cry. On one occasion he was drunk, came home at three o'clock in the morning, said he had had his arms around another woman, that her name was "Mattie" and that there was a bond between them. She was so overcome that she fainted. He was always abusing her and telling her that she was the cause of one of her boys turning out bad. She states, "he had been drinking for the last twenty years, but worse during the last seven years, particularly the last two years, pretty near everyday he was drunk." He was continuously abusing her and calling her vile names. This is in substance her story.

Her son testified that when he was six years of age, he saw his father hit his mother and knocked her off the piano stool and that she was unconscious for a while. The next occasion was when he was about twelve years old, he was going out on an errand for his father and when he was gone about one hundred feet, he turned back and looked into the window and saw his mother lying on the floor. His father had struck her and rendered her unconscious for a few minutes and he helped to revive his mother. He saw him strike her. The same son testified that his father was frequently drunk, that patients would come to see him, sometimes waited two or three hours, got disgusted and went away, and that this state of intoxication was present almost all of the time.

It is very clear that respondent was a hard drinker and that fact in itself renders some plausibility to the wife's narrative. The wife is further corroborated by the testimony of her sister, Mrs. Richardson, who was present on one occasion when the respondent had a few drinks in him and she states that he used such terrible language to his wife that she fainted and that it took ten or fifteen minutes to bring her around. It appears that the wife owns the home, that the husband is an osteopath and chiropractor and the financial arrangements between the husband and wife were not satisfactory, the order for support that was made upon him by the court has not been complied with promptly. We need not go into that feature of the case.

The respondent denies having done any of the acts of cruelty charged, or having offered any indignities to his wife. He admits being a drinking man. He states "maybe I was drinking, but I was not as drunk as they claim." He testifies that he never cursed her, that his wife was accustomed to call different men and women very violent names and offered the ex-

cuse that he tried to break her of it and told her he would call her "that" until she quit it. The occasion upon which Mrs. Richardson testified he called his wife such outrageous names that she fainted, he also partly admits, but says that he cursed the sister. The terms he applied to his wife were the lowest that can be used. Our reading of his testimony does not convince us of his frankness. There are some witnesses called who testified that everything was going on all right between these parties, as far as they could see, but it was purely negative testimony. The court states that they credit Dr. Cready's testimony as to what he saw and observed, but witness admits that "he never got close into the family circle to know those things."

There was a witness, a Mrs. Hahn, called, who testified that the wife hit the husband across the head and banged his head with her fist and the next time she told her, "Look at my hands from hitting that damned fool over the head. The next time I will get a bottle." This is contradicted by the wife and strange to say, is not corroborated by the respondent.

The testimony of the boy was disregarded by the master and the reason for it is found in the fact that he evasively denied "that he had priorly declared that he did not believe in a Supreme Being." The testimony referred to reads as follows: "Q. Do you believe in a Supreme Being? A. Yes, sir. Q. Did you ever tell anybody you did not believe in a Supreme Being? A. Not that I know of." The woman called as a witness said that she had only seen this man a couple of times in the last thirty years or so, that "he used to come out and tell me he did not believe in a God or a hereafter." This whole inquiry was contrary to the provisions of the Act of the 23rd of April, 1909, P. L. 140, and should have had no consideration. Even if the act of assembly had not been

passed, this witness testified that he believed in a Supreme Being and while he may have expressed doubts many years ago, that should not have affected his credibility. The corroboration furnished by this boy as to his mother should have had proper consideration and his truthfulness should not have been impeached by this incompetent testimony. We are not struck by the argument that it is not likely that the witness would remember an incident which happened when he was six years of age. The event was not such as would ordinarily occur and pass without notice, but on the contrary would be calculated to make a lasting impression upon a lad of that age.

The court in banc placed great reliance upon the fact that the trial judge saw the several witnesses and heard them testify and had much better information than we have as to forming a correct judgment as to their credibility and the evidential value of their testimony. While this element in the case is entitled to consideration, it was not binding upon the court below in banc or is it upon this court. We must pass our independent judgment upon the case as presented. We place no reliance upon the testimony of the respondent. His answers are not such as to convince us that he is telling the truth.

The court below in its opinion came to the conclusion that "the respondent used vile and vituperative language toward the libellant, that he drank intoxicating liquor excessively and subjected libellant to mental annoyance," but did "not think there was sufficient proof to show that the libellant's condition was intolerable and her life burdensome," and that there was sufficient credible testimony that she furnished provocation for some of the mistreatment accorded her and subjected the respondent to physical abuse. We do not agree with the statement that there was not sufficient proof to sustain libellant's allega-

tions and find nothing that would show sufficient provocation to justify respondent's course of conduct.

The order of the lower court is reversed and the record remitted with the instructions that a decree granting the divorce be entered, the appellee to pay the costs.