**Joseph T. PAWLIK, Appellant,**

v.

**Ivy C. PAWLIK, Appellee.**

**No. 46A04–0409–CV–478.**

Court of Appeals of Indiana.

March 8, 2005.

Transfer Denied May 12, 2005.

Stephen A. Kray, LaPorte, IN, Attorney for Appellant.

Donald W. Pagos, Michigan City, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Joseph T. Pawlik (Pawlik) appeals an order granting physical custody of his daughter, M.P., to Ivy C. Collins (Collins), M.P.'s mother and Joseph's ex-wife. Pawlik challenges that ruling on only one basis, which is reflected in the following restated issue: Did the trial court err in permitting Collins's counsel to question Pawlik's mother about her religious beliefs and practices?

We affirm.

The facts favorable to the ruling are that Collins and Pawlik were married on March 16, 2002 and M.P. was born to the marriage approximately nine months later.

The parties' relationship deteriorated and in November 2003, Pawlik moved out of the marital residence and into his parents' house. On December 12, 2003, Pawlik filed a petition for dissolution. The final hearing was held on July 28 and August 3, 2004. The decree of dissolution was entered on August 3, 2004.

Both parties sought physical custody of M.P. Between the date of separation and the date of dissolution, the parties shared physical custody of M.P., with each parent having the child every other week. During the weeks she was in Pawlik's custody, M.P. stayed with him at his parents' home. It is also noteworthy that during the separation period, Collins moved to Wakeman, Ohio. In the decree of dissolution, the court awarded physical custody to Collins, with Pawlik getting reasonable parenting time, including one week per month from September through May, six weeks in the summer, and "reasonable rights of visitation or parenting time in the area of Wakeman, Ohio, subject to the condition that he provide 72 hours advance notice to [Collins] of his desire to exercise such visitation[.]" *Appellant's Appendix* at 5. Pawlik appeals the award of physical custody to Collins on one particular basis: he claims the trial court erred in permitting Collins's counsel to question Pawlik's mother, Mary Ann Pawlik (Mary Ann), about her religious beliefs and practices. We will provide further facts where relevant.

We commence our review mindful that the trial court is in a better position than we are to render a decision on the merits concerning child custody. This is because the trial court can observe the parties' conduct and demeanor and listen to their testimony. The value of such close proximity cannot be overstated in the matter of deciding custody, where courts are " 'often called upon to make Solomon-

like decisions in complex and sensitive matters.' " *Trost–Steffen v. Steffen,* 772 N.E.2d 500, 509 (Ind.Ct.App.2002), *trans. denied* (quoting *Speaker v. Speaker,* 759 N.E.2d 1174, 1179 (Ind.Ct.App.2001)). Therefore, we will reverse a custody determination only if it is clearly against the logic and effect of the facts and circumstances before the trial court, or the reasonable inferences drawn therefrom. *Trost–Steffen v. Steffen,* 772 N.E.2d 500. When reviewing the trial court's decision, we will not reweigh the evidence, judge witness credibility, or substitute our judgment for that of the trial court. *Id.*

This appeal involves the propriety of inquiring, during a proceeding to determine child custody, into the religious beliefs and practices of a party who may become or will be instrumental as a caretaker of the child. In this particular case, Collins's counsel questioned Mary Ann, who is a Jehovah's Witness, extensively about her involvement in that faith. Pawlik contends such questioning "violated the fundamental concepts of religious freedom and tolerance embodied in the Constitutions of the United States of America and Indiana, and *Indiana Evidence Rule 610.*" *Appellant's Brief* at 4. Although Pawlik invokes different provisions of those constitutions in presenting his argument, those references are very general in nature. He has not undertaken an analysis, detailed or otherwise, of the purportedly relevant constitutional provisions. Rather, the essence of his argument is that permitting counsel to question Mary Ann on her religious beliefs violated Rule 610. At most, Pawlik's argument assumes that the purported constitutional protections are coterminous with the strictures of Rule 610. Therefore, we will focus our discussion on Rule 610.

"Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that, by reason of their nature, the witness's credibility is impaired or enhanced." Evid. R. 610. Pawlik contends the following excerpts from Mary Ann's cross-examination, which are representative of the tone and tenor of that questioning and testimony, contravene the prohibition contained in Evid. R. 610:

Q. You go [to the Kingdom Hall for church services] several times a week?

A. Uh-huh.

Q. Do you read [M.P.] Jehovah Bible stories?

A. No.

Q. As a Jehovah's Witness, are you discouraged, for example, from wearing or displaying a cross or a crucifix?

\* \* \* \* \*

A. Well, we don't wear—well, we don't wear them because if you go in and you research, you find out that Jesus Christ didn't die on a cross. It actually was a pagan symbol. That's why we do not wear them.

Q. All right. So you are discouraged then as a Jehovah Witness from wearing or displaying a cross or crucifix?

A. No, it's my conscience. I'm not discouraged. You know, it's part of a pagan religion. And if you would do research, you would find that such [sic].

Q. Are you discouraged from saluting the flag?

A. I do not salute the flag for the simple reason that I'm not—I pay my allegiance to my God, the God of the Bible, Jehovah. And I don't disrespect the flag. I would not ever do anything to disrespect the

flag, spit on it, do any damage to the flag. I would not—you know, I have respect for laws, the government and laws. I wouldn't do anything to—

* * * * *

Q. Do you also refrain from celebrating holidays?

A. I do not celebrate certain holidays—religious holidays because of the origin of the holiday. And anybody can look in the encyclopedia and find out that a lot of the religious holidays all stem from pagan religion, start in Babylonia [sic]. That is the reason why I and all of the Jehovah's Witnesses do not celebrate those holidays.

Q. And you don't celebrate birthdays either, do you?

A. No, we don't. No.

* * * * *

Q. —you don't believe in celebrating birthdays? According to your religion, it's too pagan?

A. The Bible has two birthdays that were celebrated in there and they were of men who were ungodly men. And again, you know, that's something that anybody can find out. No. But that doesn't mean that my son—my son is not one of Jehovah's Witnesses.

Q. We're talking about you.

A. Okay. Fine.

Q. You're not too crazy about the Girl Scouts either. Right?

A. What do you mean Girl Scouts?

Q. In your religion?

A. I don't know about that. I never got into the Girl Scout thing. I don't—

* * * * *

Q. What is your position on voting?

* * * * *

A. What was I saying? No, I don't vote. I don't get involved in political—because when you get involved with politics, you are saying that you want that person to—you're saying you want that person to represent you. And no, I don't. But I still have respect for the governments and the rulers of the world. I do.

* * * * *

Q. Aren't there going to be about 144,-000 people that will be chosen in your religion?

A. 144,000?

Q. Yes.

A. Well, in Revelation 7 and 14, it does say there are 144,000 that will be reigning with Christ in heaven for a thousand years and they will be kings and priests. It says that in that—

Q. And you believe that as part of the Jehovah Witness religion?

A. Yes. That's—that's what the Bible says, you know.

Q. Are you one of the 144,000?

A. Am I one of the 144,000?

Q. Uh-huh.

A. Am I one of the chosen ones? That's something that is a personal thing with each person. Whoever it is, it's a personal thing.

Q. Is [Pawlik] one of the 144,000?

A. I don't think so. He's not one of Jehovah's Witnesses.

Q. Is [M.P.]?

A. She's not one of Jehovah's Witnesses.

Q. Would you like her to follow your path through Jehovah's Witnesses?

A. That's up to her father.

*Transcript* at 53–60.

In support of his contention that the foregoing violated Rule 610 proscription, Pawlik cites three cases from other states. We will briefly summarize those cases. The appellant in *Winter v. Winter,* 102 Pa.Super. 300, 156 A. 603 (1931) was a woman appealing a lower court ruling denying her petition for divorce from her husband. The appellant filed for divorce on grounds that her husband physically abused her constantly over a long period of time. The wife testified extensively about the abuse she had suffered at her husband's hands—claims that her husband denied. In support of her petition, the wife called the couple's son, who testified that he saw his father abuse his mother several times while growing up. According to the court, "The testimony of the boy was disregarded by the master, and the reason for it is found in the fact that he evasively denied 'that he had priorly [sic] declared that he did not believe in a Supreme Being.'" *Id.* at 604. The challenged testimony involved a witness called by the husband to discredit the son. That woman "said that she had only seen this man a couple of times in the last thirty years or so, that he used to come out and tell me he did not believe in God or a hereafter." *Id.* (internal quotation marks omitted). The appellate court held that the witness's testimony violated a Pennsylvania provision substantially similar to Rule 610 and should not have been permitted.

The second case, *People v. Hall,* 391 Mich. 175, 215 N.W.2d 166 (1974) involved the appeal of a conviction for "uttering and publishing." *Id.* at 166. During the course of the defendant's cross-examination, the prosecutor asked whether the defendant believed in a supreme being. The defendant responded that he did. There ensued a discussion about whether the defendant would lie under oath to escape punishment. The Michigan court concluded that questioning the defendant about his religious beliefs was improper, explaining:

> The prosecutor prefaced this line of questioning by inquiring into the religious belief of the defendant. By so doing he insinuated to the jury that the veracity of defendant's testimony was somehow correlated to the strength and conviction of defendant's religious beliefs. He implied that one who believes in God is apt to be more truthful than one who does not. If this is to be permitted, there in no logical reason why the prosecutor may not then inquire into the nature of defendant's religion. Would it not follow that perhaps some religions may have a greater reputation for truth and veracity than others? The criminal trial would revert to no more than a modern day inquisition; with the defendant being tried, convicted and punished on the nature of his religious beliefs.

*Id.* at 170.

The third and final case cited by Pawlik is *Commonwealth v. Brown,* 247 Pa.Super. 401, 372 A.2d 887 (1977), in which the defendant appealed a robbery conviction. The challenged evidence involved two defense witnesses who were asked several questions about their Muslim faith. Those witnesses were called to establish an alibi for the defendant, claiming to have seen him elsewhere in a bar at the time the robbery in question was committed. The court reversed the conviction upon its conclusion that the trial court erred in permit-

ting questions about the witnesses' Muslim faith, stating:

> In the instant case, however, the lower court allowed the prosecution to question the two witnesses as to their religious beliefs because they might have been biased towards appellant as a 'brother' Muslim and because the Muslim religion frowns on the presence of its adherents in bars. In short, the lower court sanctioned questions designed to directly impugn the credibility of appellant's two alibi witnesses.

*Id.* at 891.

*Winter, Hall,* and *Brown* all share an important characteristic. In each, the questions pertaining to the witness's religious beliefs were clearly intended to impeach the credibility of that witness—i.e., to cause the fact-finder to disbelieve the witness's testimony. The same cannot be said of the questioning of Mary Ann in the instant case. The veracity of the information provided by Mary Ann was never really called into question. That is, the value of Mary Ann's testimony was not in buttressing her son's side of contradictory accounts of events; this was not a classic "he said-she said" credibility contest. Thus, Collins's counsel did not seek to discredit Mary Ann's truthfulness in asking her to explain her religious views and practices. Rather, counsel sought to illuminate for the court what sort of a factor Mary Ann would be in regard to M.P.'s religious training in the event Pawlik was awarded physical custody of M.P. Is that permissible? We conclude that, according to Ind.Code Ann. § 31–17–2–17 (West, PREMISE through 2004 2nd Regular Sess.), it is.

I.C. § 31–17–2–17 states: "Except: (1) as otherwise agreed by the parties in writing at the time of the custody order; and (2) as provided in subsection (b); the custodian may determine the child's upbringing, including the child's education, health care, and religious training." The foregoing provision confers upon the party awarded custody of a child the right to direct the child's religious training. Therefore, like any other matter affecting a child's health, education, and general welfare, the religious beliefs and practices of a party seeking custody are appropriate topics for the court to consider. It would make no sense to confer that right upon a custodial parent by virtue of the court's custody decision, but forbid the court from exploring factors that might come to bear upon the parties' respective exercise of the right.

■ This is not to say the trial court should or even could make its determination based upon an assessment of which parties' religious beliefs are preferable. That clearly would be inappropriate. There are, however, legitimate reasons for the court to consider such evidence. For instance, the court is empowered to order the noncustodial parent to refrain from allowing the child to participate in activities that are inconsistent with the custodial parent's religious beliefs. *See, e.g., In re Paternity of K.R.H.,* 784 N.E.2d 985 (Ind. Ct.App.2003) (the trial court did not err in forbidding mother from taking child to any church other than a Roman Catholic church—which was the father's church). The court might also need to know of the custodial parent's religious beliefs in fashioning its visitation schedule. *See, e.g., A.G.R. ex rel. Conflenti v. Huff,* 815 N.E.2d 120 (Ind.Ct.App.2004) (the court did not err in ensuring child would be able to attend religious service with custodial parent), *trans. denied.* The court also might need information about the parties' religious beliefs for purposes of determining the noncustodial parent's duties under the decree of dissolution. *See, e.g., id.* (trial court did not err in ordering noncus-

todial parent to transport child to custodial parent at a time that would enable child to attend religious service with custodial parent). In short, there are practical, value-neutral reasons for the court to consider the parties' religious beliefs and practices that do not infringe on any of the parents' religious constitutional rights and liberties. We are satisfied that the questioning concerning Mary Ann's religious beliefs was not intended to buttress or impugn her credibility, but was instead aimed at gathering facts relevant to child custody and visitation matters to be decided by the trial court.

In summary, we emphasize that Rule 610 applies in dissolution and custody proceedings just the same as it does in all other proceedings. We clarify today, however, that it does not operate as an absolute bar to evidence about the religious beliefs of parties seeking custody of a minor child. Rather, by its own terms, it operates only to bar the use of such testimony if it is offered for the purpose of buttressing or impugning the credibility of a witness. In the instant case, Pawlik lived with his parents at the time of the final hearing and had done so for a period of eight months. Although Pawlik testified that his goal was to secure his own housing, he admitted nothing had been done in that respect. It was undisputed that while Pawlik lived with Mary Ann, she assumed considerable responsibility in taking care of M.P. on a daily basis. Finally, we note that Mary Ann acknowledged Pawlik and M.P. did not share her religious convictions and practices. She further acknowledged that M.P.'s religious instruction would be Pawlik's responsibility—not Mary Ann's—in the event that Pawlik was awarded custody. Under these circumstances, and after reviewing the disputed cross-examination, we are satisfied the questioning of Mary Ann about her religious beliefs did not run afoul of Rule 610, and therefore did not violate anyone's constitutional rights. There being no other claim of error, we affirm the judgment of the trial court.

Judgment affirmed.

SHARPNACK, J., and BAKER, J., concur.