**In re the MARRIAGE OF Barbara KENDA, Appellant–Petitioner,**

**and**

**Boris PLESKOVIC, Appellee–Respondent.**

**No. 71A03–0701–CV–34.**

Court of Appeals of Indiana.

Sept. 21, 2007.

Michael A. Wilkins, Ice Miller LLP, Indianapolis, IN, Attorney for Appellant.

Andrew Z. Soshnick, Amanda R. Blystone, Baker & Daniels LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Barbara Kenda ("Mother") appeals a custody modification order awarding Boris Pleskovic ("Father") custody of their child, A.P.K. We affirm.

### Issues

Mother raises two issues:

I. Whether the trial court had jurisdiction to modify the custody order of a court of another state; and

II. Whether the trial court abused its discretion in modifying custody, awarding sole legal and primary physical custody of A.P.K. to Father.

### Facts and Procedural History

Mother and Father, both citizens of Slovenia, are the parents of A.P.K., who is now six years old. Mother and Father were married in Rome in 2000. At the time of their divorce on May 17, 2002, the parties resided in the District of Columbia. The District of Columbia Superior Court ("D.C. Court") ordered that Mother would have sole physical custody and that the parties have joint legal custody of A.P.K. The D.C. Court's order also granted Father parenting time, not to exceed seventy days per year.

In the time before and shortly after the divorce, the parties were able to coordinate Father's time with A.P.K. without great difficulty. During this time, Mother and Father lived only a few blocks away from each other in Washington D.C. In May of 2002, Mother took A.P.K. with her to Slovenia and returned to the United States in August of 2002 to live in South Bend, Indiana, where Mother became a tenure-track professor at the University of Notre Dame. Throughout this time, Father continued to make arrangements to visit A.P.K. On occasion, Mother would ask Father if he could take care of A.P.K. when she was busy with work or sick. Father would cooperate, adjusting his work schedule.

The situation changed in the summer of 2005. After A.P.K. returned from a trip to

Slovenia with Father in July of 2005, Mother refused to permit Father to have unsupervised parenting time with A.P.K., because she alleged that A.P.K. was sullen, tearful, angry and had begun to play with his private parts excessively. Mother believed that unspecified events that occurred on the summer trip to Slovenia with Father triggered these new behaviors exhibited by A.P.K. Thereafter, Father received a letter from Mother's attorney in Washington D.C., informing him that he needed to hire a lawyer, that he was not to communicate with Mother about visitation with A.P.K., and that Mother would no longer cook and clean for him.

On October 26, 2005, Mother filed a motion to modify non-custodial parenting time in St. Joseph County Superior Court. In this motion, Mother requested the Indiana court to limit Father's parenting time rights. The motion also read, in part:

> This court has jurisdiction to grant the requested relief pursuant to the Uniform Child Custody Jurisdiction Law, codified in Indiana at Ind.Code 31–17–3, et seq., because Indiana is the "home state" of the subject child, and because the child and his mother have a significant connection to Indiana and there is available in Indiana substantial evidence concerning the child's present and future care, protection, training and personal relationships.

Appellant's Appendix at 40.

On November 14, 2005, Father filed a Petition for Modification of Custody, Parenting Time, and Child Support and Request for Custody Evaluation. In his motion, Father provided the following reasons why he should have custody of A.P.K.: (1) Mother restricted his access to A.P.K. and had not allowed parenting time since August 5, 2005; (2) Mother left A.P.K. with others for several months at a time without informing Father; (3) Mother demeans

Father to A.P.K.; and (4) Mother is engaged in an attempt to alienate A.P.K. from Father.

Subsequently, the parties jointly selected Dr. Anthony Berardi to conduct a custodial evaluation. Dr. Berardi conducted numerous interviews with Mother, Father, and A.P.K. during April and May of 2006 and submitted his final report to the trial court on July 7, 2006, recommending that Mother have physical custody of A.P.K.

In February of 2006, Father filed a Petition for Contempt Citation in order to obtain unrestricted parenting time with A.P.K. as provided in the divorce decree issued by the D.C. Court. Father alleged that Mother had refused to allow any parenting time since August of 2005 unless it was supervised, which was not a requirement under the divorce decree. The hearing on the petition was held on March 30, 2006. After taking the arguments presented under advisement, the trial court ordered that Father was entitled to parenting time, by telephone, on certain evenings each week and that Father would be reunited with A.P.K. at a subsequent appointment with Dr. Berardi. Following their reunion, the trial court issued subsequent orders, specifying when Father would have parenting time while the case was pending.

Since December of 2005, Mother had been applying for jobs and eventually accepted a position in February as Director of Education for The Prince's Foundation for the Built Environment in London, England. Mother did not inform Father of the possibility that she and A.P.K. would make a transcontinental relocation. On March 16, 2006, Mother filed a Notice of Intent to Move, indicating her plans to relocate to London, England in May of 2006. Four days later, Father filed a Petition to Enjoin Relocation of Minor Child, requesting the trial court to prohibit Moth-

er from removing A.P.K. from the U.S. One month later, Mother filed a Motion to Allow Overseas Travel with Minor Child, asserting that, if she was not permitted to temporarily relocate to London, she would become unemployed and would possibly lose her green card status in the U.S. The trial court held a hearing on the relocation motions on May 5, 2006, and issued its order three days later. The order prohibited the removal of A.P.K. from St. Joseph County, Indiana without a court order. Specifically, Mother was enjoined from relocating A.P.K. to London. In compliance with this limitation, Mother left A.P.K. in the care of a family friend when she relocated to London later that summer to begin her new job.

As the final hearing drew nearer, the trial court ordered each parent to have uninterrupted parenting time in St. Joseph County, Washington D.C., London, or Slovenia. The order also noted that the failure of a party to transfer A.P.K. to the other parent or failure to return with the child for the final hearing would result in contempt findings and sanctions and would be used as evidence in the final determination of custody. Prior to the final hearing scheduled for September 11, 2006, A.P.K. was scheduled to be with Mother in London.

Four days before the scheduled final hearing and six weeks after Mother's counsel had withdrawn his appearance on her behalf, Mother's new counsel entered an appearance and requested a continuance. The next day, the trial court held a hearing on the motion to continue at which neither Mother nor Father was present. Mother's new counsel indicated that Mother had officially retained her services two days prior and that counsel had yet to obtain the file from the previous attorney. Concerns of allowing a continuance voiced by Father's counsel were that the trial court's arranged parenting time was only effective until August 31st, A.P.K. was currently with Mother in London, Father had been unable to talk with A.P.K. by telephone due to Father's calls going unanswered, and the belief that Mother's decision to retain new counsel in the eleventh hour before the final hearing was part of Mother's strategy. The trial court asked Mother's counsel whether Mother had purchased airline tickets to be present for the final hearing. Her counsel did not know. Father's counsel stated that Father had already made transportation arrangements from Washington D.C. to be at the final hearing. Despite expressing similar concerns to those of Father, the trial court granted a continuance of the final hearing to the first of November with the strict mandate that it would not be rescheduled again unless good cause was demonstrated. The trial court also ordered parenting time for Father between September 16 and October 10 after which A.P.K. was to be returned to Mother in London until the November hearing and ordered Mother to reimburse Father for monies he paid for his travel plans for the original date of the final hearing.

On September 15, 2006, Mother filed an Emergency Petition to Stay Parenting Time, alleging that A.P.K. was enrolled in a school in London and subject to the compulsory attendance law. Mother contended that if A.P.K. was out of school for parenting time with Father in Washington D.C. she would be subject to criminal charges based on the English compulsory attendance law. After a hearing on the petition, the trial court first noted that Mother's action of enrolling A.P.K. in a school violated a prior order prohibiting relocation of A.P.K. to London. The trial court also explained that it held the belief that A.P.K. would qualify for one of the exceptions to the English compulsory at-

tendance law,[1] because he would be out of the country pursuant to a court order and that it is a temporary situation. Mother's petition was denied.

On September 22, Mother initiated an action[2] against Father in the High Court of Justice in London, England, resulting in an *ex parte* order from the English Court prohibiting Father from taking any steps to enforce the Indiana trial court's order allowing parenting time between September 16 and October 10. The order also set a hearing to determine questions of jurisdiction and habitual residence of A.P.K. for October 5, 2006. In response, Father filed an Emergency Petition for Change of Custody with the Indiana trial court, claiming that Mother's actions constitute a substantial and continuing change of circumstances that makes the *status quo* unreasonable. Hours before the hearing on Father's Emergency Petition on September 27, Mother filed a Motion for Change of Judge. The trial court treated the motion as a motion for recusal and denied it. After taking the evidence and arguments presented at the hearing under advisement, the trial court granted Father's petition, giving Father temporary legal and physical custody of A.P.K., provided that Mother enjoy parenting time with the child until October 16. The order required Mother to return A.P.K. to Father's care on October 16 with Father

retaining care of the child until the November trial. The trial court reasoned that Mother's action of involving the English Court in the custody dispute and failing to note to that court that A.P.K. would fall within the exceptions of the English compulsory attendance law was a direct challenge by Mother of the Indiana trial court's jurisdiction.

On October 12, Mother's London counsel informed Father's counsel that A.P.K. would not be produced on October 16, because they were awaiting the decision of the English Court. Shortly thereafter, Father filed an application with the English Court pursuant to the Hague Convention on Civil Aspects of International Child Abduction to inform the court of the pending proceedings in Indiana and Mother's violations of the Indiana trial court's orders. In addition, Father filed a Petition for Contempt Citation with the Indiana trial court, noting Mother's refusal to return A.P.K. to Father's custody as ordered.[3] The actions in the English Court were resolved by an agreement of the parties, which was reduced to an order on November 7, 2006, six days after the final hearing in Indiana. The English Court's order provided that A.P.K. would be returned to the U.S., accompanied by Mother, two days prior to the delivery of judgment by the Indiana trial court. The order also held that the parties agreed and

---

1. Section 444 of the Education Act of 1996, according to the copy obtained by Father's counsel via the internet, has exceptions to the compulsory attendance rules, including:
 (3) The child shall not be taken to have failed to attend regularly at the school by reason of his absence from the school—
 (a) with leave,
 (b) at any time when he was prevented from attending by reason of sickness of any unavoidable cause, or
 (c) on any day exclusively set apart for religious observance by the religious body to which his parent belongs.

 Educ. Act, 1996, c. 56, § 444 (Eng.), *available at* http://www.legislation.hmso.gov.uk/legislation/uk.htm.

2. Mother did not inform Father nor her Indiana trial counsel that she had initiated this action until the order from the English Court was e-mailed to all parties in this action.

3. Based on the record, it does not appear that any further action or ruling was made on this petition.

the English Court acknowledged "that all matters relating to the welfare of the child are at present vested in the St. Joseph Superior Court of Indiana." Appellant's App. at 186.

In the intervening time, Mother's counsel withdrew their representation, alleging that Mother's conduct had caused a breakdown in the attorney-client relationship rendering any further representation unreasonably difficult. Mother consented via e-mail to her attorneys' withdrawal and requested a postponement of the final hearing. The trial court reiterated that the final hearing would not be postponed.

The final hearing did occur on November 1, 2006. The trial court had communicated with Mother that she would be able to proceed *pro se* via telephone and instructed her to call at 10 a.m. on the day of the final hearing. By 10:15 a.m., no calls had been received, so the hearing commenced. Approximately one hour into Father's testimony, Mother did call the trial court and was able to cross-examine Father and present her testimony. The trial court took the evidence under advisement and ordered the parties to appear on December 20, 2006, to receive the decision. Mother was also ordered to return A.P.K. to St. Joseph County two days prior to the ruling. Accordingly, the trial court announced its decision to deny Mother's request for supervised parenting time and grant Father's petition for modification of custody.[4]

Mother now appeals.

### Discussion and Decision

#### I. Jurisdiction to Modify Custody

■ On appeal, Mother first argues that the trial court did not have jurisdiction under the Uniform Child Custody Jurisdiction Act ("UCCJA") to modify the custody arrangement detailed in the D.C. Court's divorce decree. Father contends that Mother waived this issue, as it was Mother who originally came to the Indiana court to request a change in parenting time. Because this case deals with an interstate custody determination, the UCCJA, then-codified at Indiana Code Section 31–17–3–1 *et seq.* (2004)[5] governs.

■ The UCCJA has provisions for the determination of jurisdiction. The trial court must first determine whether it has jurisdiction and, if it does, whether to exercise that jurisdiction. *Christensen v. Christensen*, 752 N.E.2d 179, 182 (Ind.Ct. App.2001). In determining whether a trial court has improperly exercised jurisdiction under the UCCJA, we apply an abuse of discretion standard. *Id.* An abuse of discretion will occur when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

■ In 1990, our Supreme Court held that the jurisdictional limitations imposed by the UCCJA are not that of subject-matter jurisdiction, but rather are refinements of the ancillary capacity of a trial court to exercise authority over a particular case. *Williams v. Williams*, 555 N.E.2d 142, 145 (Ind.1990). Seeking to refine the types of jurisdiction, the Indiana Supreme Court clarified that there are only two types of jurisdiction in Indiana: subject matter jurisdiction and personal jurisdiction. *K.S. v. State*, 849 N.E.2d 538, 540 (Ind.2006). The Court noted that the phrase "jurisdiction over a particular case"

---

4. In a later order, the trial court directed Mother to pay Father's attorney's fees amounting to $49,165.21. Mother does not challenge this order on appeal.

5. The UCCJA was amended and relocated to Indiana Code Article 31–21 on July 1, 2007. For our analysis, we utilize the version of the act at the time the trial court issued its order.

truly represents an issue of legal error rather than the exercise of jurisdiction. *Id.* In *Packard v. Shoopman,* the Indiana Supreme Court continued this discussion of the "jurisdiction over a particular case" misnomer, holding that if these procedural errors are not raised at the appropriate time, they are waived. *Packard v. Shoopman,* 852 N.E.2d 927, 930 (Ind.2006) (citing K.S., 849 N.E.2d at 542). Synthesizing this caselaw, if not raised timely, a party waives the procedural issue of whether a trial court has the authority under the UCCJA to modify a custody arrangement pursuant to a divorce decree issued in another state.

Here, the trial court did not analyze whether it had the authority, pursuant to the provisions in the UCCJA labeled as jurisdiction. The failure to do so may have been due to Mother's petition for modification of parenting time specifically addressing the issue:

> This court has jurisdiction to grant the requested relief pursuant to the Uniform Child Custody Jurisdiction Law, codified in Indiana at Ind.Code 31–17–3, et seq., because Indiana is the "home state" of the subject child, and because the child and his mother have a significant connection to Indiana and there is available in Indiana substantial evidence concerning the child's present and future care, protection, training and personal relationships.

Appellant's App. at 40. Furthermore, Father also voluntarily and affirmatively engaged the same Indiana trial court by filing a petition to modify custody, parenting time, and child support. Neither party objected to the trial court presiding over the matters presented to it, and both Mother and Father have actively participated in the related proceedings, spanning over a year.

■ One purpose of the UCCJA is to prevent parents from seeking custody in different jurisdictions in an attempt to obtain a favorable result. Ind.Code Ann. § 31–17–3–1 (West 2004). Mother's backpedaling argument seeks to convolute the provisions of the UCCJA by asking this Court to invalidate the trial court's ruling so that she may forum shop in the hope of obtaining her desired result. She has waived the issue in selecting Indiana as the state in which to litigate her dispute. She is not entitled to a reversal based on jurisdiction so that she may shop for a more favorable forum.

■ Waiver notwithstanding, the trial court did have the authority to modify the custody arrangement under the UCCJA. At the time Mother filed her petition, Indiana was the home state of A.P.K., because he resided in Indiana with Mother for more than six months prior to the filing. *See* Ind.Code Ann. § 31–17–3–3(a) (West 2004).[6] Therefore, the trial court had the power to modify the original custody order.

## II. Modification of Custody

■ Custody modifications are reviewed for abuse of discretion, with a preference for granting latitude and deference to trial court judges in family law matters. *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind. 2002) (quoting *In re Marriage of Richardson,* 622 N.E.2d 178, 178 (Ind.1993)). This

---

**6.** A court of this state, which is competent to decide child custody matters, has jurisdiction to make a child custody determination by initial or modification if this state is the home state of the child at the time of commencement of the proceeding. Ind.Code Ann. § 31– 17–3–3(a)(1)(A) (West 2004). Home state is defined as the state the child lived in with his parent(s) for at least six consecutive months before the commencement of a child custody proceeding. Ind.Code Ann. § 31–17–3–2(5) (West 2004).

is because the trial court can observe the parties' conduct and demeanor and listen to their testimony. *Pawlik v. Pawlik*, 823 N.E.2d 328, 329 (Ind.Ct.App.2005), *trans. denied.* The value of such close proximity cannot be overstated in the matter of deciding custody, where courts are often called upon to make Solomon-like decisions in complex and sensitive matters. *Id.* at 329–30 (internal quotation omitted). We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *Kirk,* 770 N.E.2d at 307. On appeal, it is not enough that the evidence might support some other conclusion. *Id.* Rather, the evidence must positively require the conclusion contended for by the appellant before there is a basis for reversal. *Id.*

Additionally, Mother is appealing from a decision in which the trial court entered special findings of fact and conclusions of law pursuant to Father's request. See Trial Rule 52(A). Therefore, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Barger v. Pate,* 831 N.E.2d 758, 762 (Ind.Ct.App. 2005).

■■■ Under Indiana Code Section 31–17–2–21, a court may not modify a child custody order unless modification is in the child's best interests and there is a substantial change in one of the several factors. Indiana Code Section 31–17–2–8 provides that the factors relevant to a custody order are as follows:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

 (A) the child's parent or parents;

 (B) the child's sibling; and

 (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

 (A) home;

 (B) school; and

 (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Thus, a trial court may not modify custody until it determines that a substantial change has occurred and that a modification is in the child's best interests. *Barger,* 831 N.E.2d at 762. The party seeking the modification bears the burden of demonstrating that the existing custody order is unreasonable because, as a general proposition, stability and permanence are considered best for the child. *Id.*

On appeal, Mother argues that the driving factor behind the trial court's modification decision was Mother's perceived violations of the trial court's prior orders rather than the statutory factors. In effect Mother's arguments challenge only the trial court's conclusions. In essence, Mother claims that the trial court ignored the recommendation of Dr. Berardi, failed to do an analysis of the best interests of A.P.K., and instead made its decision primarily based on her violations of prior orders. However, Mother's arguments are misplaced.

Although Mother contends that the trial court failed to find a substantial change in one of the statutory factors, the trial court's order reads that a "substantial change in the relationship among the parties has occurred since the entry of the [Divorce] Decree." Appellant's App. at 25. The findings of fact support this conclusion. It is true that Mother's willful rebellion against the trial court's prior orders did play a significant .part in the reasons for modifying custody of A.P.K. However, it is not the mere violation but Mother's purpose in her actions and their effect: She desired to prohibit Father from exercising parenting time that was not supervised by her, which resulted in Father being completely cut off from having a relationship with his son.

Subsequent to the divorce decree, Father exercised parenting time with A.P.K., which usually occurred at Mother's home in Indiana or in Slovenia on extended vacations and according to Mother's terms.[7] During these visits, the parents either shared accommodations or stayed in locations proximate to each other. However, after Father had taken A.P.K. on a trip to Slovenia in the summer of 2005, Mother unilaterally terminated Father's access to A.P.K., creating her own requirement that Father's parenting time must be supervised by her due to A.P.K.'s alleged change in behavior. The allegations that Father had sexually abused A.P.K., permitted a friend to strike A.P.K., and would kidnap their child were not substantiated, yet Mother continued to insist throughout the proceedings that Father's parenting time should be supervised and proffered herself as the proper party to provide such supervision. When the trial court entered its first parenting time order, Father had not seen A.P.K. for eight months.

In light of Dr. Berardi's initial recommendations, the trial court ordered, in addition to contact by telephone, unsupervised parenting time for Father during the pendency of the proceedings. When Father called A.P.K., Mother monitored and recorded the calls, causing A.P.K. to be apprehensive and less willing to talk to Father. If a trial court finds that a parent is recording conversations as a way to interfere with the other parent's relationship with the child rather than for the well-being of the child, it may consider this as a factor in modifying custody. *Leisure v. Wheeler*, 828 N.E.2d 409, 416 (Ind.Ct. App.2005). As the Parenting Time Guidelines indicate, children should generally be able to engage in telephone conversations with a parent without the other parent recording those conversations. *Id.* The trial court concluded that Mother's monitoring was done to interfere with A.P.K.'s relationship with his father. Mother does not point to evidence to the contrary.

When Mother could not prevent Father from having unsupervised time with A.P.K., she took matters into her own hands. She moved to London, and left A.P.K. with friends instead of permitting Father to take care of him until the final hearing. When Father did have A.P.K. in his care, Mother called the police in Washington D.C. to perform a "well-being" check at 3:30 a.m. In line with its prior order stating that A.P.K. could not be taken out of Indiana without court order, the trial court set a parenting time schedule by a separate order that included time when A.P.K. would be in Washington D.C., London, and Slovenia. By this order,

7. When A.P.K. was young, Father requested time with him when all parties were in Slovenia during the summer and Christmas time. Mother would allow Father to see A.P.K., but limited the time to only a few hours per day, claiming that Father would not know how to care for such a young child.

A.P.K. would be in Mother's care in London prior to the final hearing scheduled for September 11, placing the responsibility on Mother to bring A.P.K. to the U.S. for the final hearing. She did not make the necessary accommodations. Instead, her new counsel, procured only days before the scheduled hearing, submitted a motion to continue, which was granted subject to a new order specifying parenting time until the newly scheduled final hearing.

Days later, Mother requested the parenting time order be stayed. In direct disregard of the order specifically enjoining the relocation of A.P.K. to London, Mother had enrolled A.P.K. in a London school without informing Father or the trial court. She claimed that she would be subject to criminal charges if A.P.K. missed too many days of school due to being with Father in Washington D.C. The trial court denied Mother's request for a stay of parenting time, noting that exceptions to the English law applied in this situation. That was unacceptable to Mother. She then invoked the power of England's courts to aid her in keeping A.P.K. in London. Due to Mother's actions that continued until the final hearing in November, Father only saw his son for nineteen days in the span of fifteen months, less than one third of the time originally granted by the divorce decree.

Mother mischaracterizes the motivation of the trial court in making its decision. She believes that the order was meant to punish her for her actions. This allegation is far from what is expressed in the final order:

> Mother is a devoted, loving and nurturing parent, but she is only one of two parents whom A. is entitled to have in his life.
>
> A. is attached to both parents, which may account for regression after time away from a parent; conflict between Mother and Father is detrimental to A. and yet it continues. . . . It is the observation of the Court that Father has greater insight than Mother on the effect of parental conflict on A. and the need that A. has to have both parents play nurturing roles in his life.
>
> The evidence before the Court leads the Court to conclude that Mother regrets the existence of a parent-child relationship between A. and Father and that she will not act to support that relationship, let alone nurture it. Further, there is little to no evidence from which the Court can conclude that she will not continue to act to interfere or attempt to control it if she retains "sole decision making authority," or even joint legal custody as conceived under Indiana law. It is not in the best interest of A. that his relationship with Father be truncated and managed as Mother has and continues to attempt to do.

Appellant's App. at 35.

 Fostering a child's relationship with the noncustodial parent is an important factor bearing on the child's best interest and, ideally, a child should have a well-founded relationship with each parent. *Johnson v. Nation*, 615 N.E.2d 141, 146 (Ind.Ct.App.1993). When the custodial parent denies visitation rights to the other parent without evidence that the noncustodial parent is a threat to the child, it may be proper based upon the circumstances for the trial court to modify custody. *See Bays v. Bays*, 489 N.E.2d 555, 561 (Ind.Ct. App.1986), *trans. denied.* In addition, when a parent blatantly disregards a court custody order, a trial court can draw a reasonable inference of future lack of cooperation. *Id.*

Here, the trial court found that the relationship between Father and A.P.K. was

substantially changed due to Mother's efforts to prevent such a relationship by cutting off Father's visitation rights provided by the terms of the divorce decree. This conclusion is supported by evidence, which shows that Mother went as far as seeking the assistance of England's courts so that she could keep A.P.K. in her care rather than Father's. Based on the evidence, the trial court did not abuse its discretion in modifying custody.

Affirmed.

BAKER, C.J., and VAIDIK, J., concur.