## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 18 2016, 7:57 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Jill A. Gonzalez
Muncie, Indiana

Amber M. Neal
Muncie, Indiana

### IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Max McClain, II, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Brittney Kinsey, <br> *Appellee-Respondent.* | February 18, 2016 <br><br> Court of Appeals Cause No. 38A05-1506-JP-728 <br><br> Appeal from the Jay Circuit Court <br><br> The Honorable Kimberly S. Dowling, Special Judge <br><br> Cause No. 38C01-1407-JP-24 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, M.M. (Father), appeals the trial court's Order denying him primary physical custody of his minor child, M.M., (Child), in favor of Appellee-Respondent, B.K. (Mother).

We affirm and remand with instructions.

## ISSUES

Father raises two issues on appeal, which we restate as the following:

(1) Whether some of the trial court's findings were erroneous; and

(2) Whether the trial court's calculation of Father's overnight visitation was erroneous.

## FACTS AND PROCEDURAL HISTORY

Father and Mother are the parents of the Child, who was born out of wedlock, on September 1, 2010. At the time of the Child's birth, Father executed a paternity affidavit. The parties were living together at the time of the Child's birth but separated in November 2011. Following their separation, the parties verbally agreed to a joint parenting time arrangement whereby they would alternate parenting time every other day. Also, the parties agreed that Mother and the Child would continue to reside in their rented home in Pennville, Indiana. In addition, Father agreed to pay rent, and daycare for both the Child and Mother's oldest child, T. Father, in turn, moved in with his parents who

also resided in Pennville. During that time, Mother was employed by Sallie Mae and worked long shifts. Based on that, Father would pick the Child and T. from daycare, and take care of them for days at a time.

[5] In January 2012, Mother moved from the rented home to a two bedroom apartment. The following year, on March 23, 2013, Mother married and around May 2013, she and her new husband moved to house in Pennville. On July 2, 2014, Mother and her new husband were in the process of moving to Marion in Grant County, Indiana. On that day, common to his routine, Father went to pick the Child from daycare but the Child was not there. Thinking that the Child was home with Mother, Father went to Mother's residence. No one was present. Father tried calling Mother several times, but his phone calls went unanswered. Father reported the incident to the Pennville Town Marshall Ralph Frazee (Marshall Frazee). On July 3, 2014, Marshall Frazee visited Mother's home to inquire about the Child's whereabouts. Mother did not disclose the Child's location. Also on that day, Father, accompanied by his new wife and parents, returned to Mother's home. Mother and her husband were in the process of collecting their belongings and were getting ready to leave. Father asked to see the Child, but Mother told him, "my attorney would be getting hold of you." (Tr. p. 331). According to Mother, Father's mother was standing by their vehicle yelling at them, whereas Father blocked their driveway with his vehicle. Eventually, Mother and her husband were able to leave. Father's parents followed Mother's vehicle to Montpelier, Indiana. Mother and her husband stopped at a police station to report the incident. The

police allowed them to leave, while they talked to Father's parents. Mother was shaken up by these events.

[6] After being denied contact with the Child, on July 11, 2014, Father filed a verified petition for immediate custody. Father also filed a petition to set temporary parenting time according to the Indiana Parenting Time Guidelines (Guidelines) until custody is determined. Around that time, Father received notice that Mother had filed an *ex parte* protective order against him for stalking.[1] On September 9, 2014, the parties agreed to a temporary parenting time agreement as per the Guidelines. Also on the same day, Mother filed a verified counter petition to establish paternity of the Child. Father, in turn, filed a petition for citation regarding Mother's failure to file a notice of intent to relocate. On October 1, 2014, Father filed another petition seeking to establish paternity, custody, and parenting time. After a pre-trial hearing on October 13, 2014, the trial court entered an order limiting the issues to custody, parenting time, and child support.

---

[1] The record shows that the trial court held a hearing on October 31, 2014. Subsequently, on November 3, 2014, the trial court issued a protective order with an expiration date of December 14, 2014.

[7] An evidentiary hearing was held on February 11, 2015. Since the parties were unable to present all their evidence, the trial court continued the matter to April 20, 2015. The hearing was ultimately concluded on April 21, 2015. On May 28, 2015, the trial court entered an initial custody, parenting time, and child support order. The Order awarded the parties joint legal custody of the Child with Mother having primary physical custody.

[8] Father now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Modification of Custody*

#### A. *Standard of Review*

[9] As a preliminary matter, we note that Mother did not file an appellee's brief. When an appellee does not submit a brief, we do not undertake the burden of developing arguments for that party. *Thurman v. Thurman*, 777 N.E.2d 41, 42 (Ind. Ct. App. 2002). Instead, we apply a less stringent standard of review and may reverse if the appellant establishes prima facie error. *Id*. Prima facie error is "error at first sight, on first appearance, or on the face of it." *Van Wieren v. Van Wieren*, 858 N.E.2d 216, 221 (Ind. Ct. App. 2006).

[10] Child custody determinations "fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion." *Liddy v. Liddy*, 881 N.E.2d 62, 68 (Ind. Ct. App. 2008), *trans. denied*. This is because the trial court can observe the parties' conduct and demeanor and listen to their testimony. *Pawlik v. Pawlik*, 823 N.E.2d 328, 329 (Ind. Ct. App. 2005), *trans.*

*denied*. The value of such close proximity cannot be overstated in the matter of deciding custody, where courts are "often called upon to make Solomon-like decisions in complex and sensitive matters." *Id*. at 329-30 (internal quotation omitted). As such, we will reverse the trial court only if we conclude that the trial court's decision is against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom. *Id*. at 330. When reviewing a trial court's decision, we will not reweigh the evidence, judge witness credibility, or substitute our judgment for that of the trial court. *Id*.

[11] In general, an initial custody order is determined in accordance with the best interests of the child. *Baxendale v. Raich*, 878 N.E.2d 1252, 1254 (Ind. 2008). Regarding the determination of initial custody in a paternity proceeding, Indiana Code section 31-14-13-2 provides as follows:

> The court shall determine custody in accordance with the best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> (A) the child's parent or parents;
>
> (B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a *[de facto]* custodian . . .

[12] Here, although neither party requested specific findings of fact and conclusions thereon, the trial court *sua sponte* made findings awarding joint legal custody to the parties with Mother having primary custody of the Child. Our standard of review in this instance is well settled:

> Pursuant to Indiana Trial Rule 52(A), we do not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. Where, as here, the findings and conclusions are entered *sua sponte*, the specific findings control only as to the issues they cover, while a general judgment standard applies to any issues upon which the trial court has not found, and we may affirm a general judgment on any theory supported by the evidence adduced at trial.

*Kietzman v. Kietzman*, 992 N.E.2d 946, 948 (Ind. Ct. App. 2013) (citations and quotations omitted).

[13] With this standard in mind, our supreme court has expressed a preference for granting latitude and deference to our trial judges in family-law matters. *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993). Recently, it emphasized this principle once again, stating that such deference is necessary because of trial judges "unique, direct interactions with the parties face-to-face." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). "Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." *Id*.

[14] Father first asserts that the Order is devoid of Mother's unilateral decision to alienate Father's contact with the Child from July 2014 to September 2014. On that issue, the trial court entered the following finding

> 8. There was an incident in July 2014 wherein Mother and her new husband decided to move to Grant County. They did so without telling Father and his family. While this was not something that the Court would normally accept, the Court does understand how this all came together to be a "perfect storm." Unfortunately, Father and [the Child] paid a price in their relationship which still affects both of them to date.

(Appellant's App. p. 77). Although not in extensive detail as Father would wish, the above finding mentions Mother's action to thwart Father's contact with the Child in July 2014. Despite Mother's actions, the trial court took into account the events leading up to Mother's decision. The trial court entered the following pertinent findings:

5. The parties lived together at the time of [the Child's] birth until 2011. When the parties split, Mother retained physical custody of [the Child]. Time with [Father] evolved into an every other day arrangement. However, Father's parents would stop by unannounced, and want to take [the Child] (and his older step sister). This put Mother in the position of being the "bad guy". Grandchildren typically want to go with their grandparents, and it was Mother's time to which she was entitled. By saying no, it puts her in a very bad position with [the Child]. By saying yes, she loses out on her own time.

6. Additionally, Father's parents would drive by Mother's home; they would take [the Child] and not make specific arrangement about his return, requiring Mother to make several attempts to get him back; and their interference extended to Mother's older child as well.

7. Mother eventually got to the point where she felt isolated and controlled by Father's family. While the Court does not believe that Father's family intended her to feel this way, it was a legitimate feeling and she is entitled to her feelings and fears.

****

9. It is the Court's belief that after listening to all of the testimony, Father more fully understands what Mother went through and how she made this decision . . .

(Appellant's App. p. 77). Father does not challenge any of the above findings.

[15]     Next, Father argues that the Order is devoid of Mother's continuous pattern of moving residences. Father argues that Mother's relocation was not made in good faith but was only done so as to impede his contact with the Child. We note that when a parent whose child is the subject of a custody or parenting time order seeks to relocate, he or she must provide notice to both the trial court

and the non-relocating parent of his or her intent to move. Ind. Code §§ 31-17-2.2-1(a); -3(a)(1). Indiana's Relocation Statute mandates that this notice must provide the non-relocating parent with the relocating parent's new address and phone number, the intended move date, "the specific reasons for the relocation of the child[,]" a proposed revised parenting time schedule, and information about the non-relocating parent's ability to object. I.C. § 31-17-2.2-3(a)(2).

[16] The record shows that Father filed at least two verified petitions seeking a remedy for Mother's relocations. However, the record shows that there was no custody order entered by the trial court until September 2014. By that time, Mother had already moved from Pennville to Marion, Indiana. Moreover, the record shows that on October 13, 2014, the trial court entered a pre-trial order limiting the issues to custody, parenting time, and child support. Furthermore, during the evidentiary hearing, Father failed to argue that Mother's relocation was not in good faith or for a legitimate purpose. Mother however cited familial benefits—Mother had friends and family support in Marion, Indiana. Accordingly, we decline Father's offer to address the matter of Mother's relocation.

[17] Father also argues that Finding #11 is erroneous. The finding stated:

> Father has taken [the Child] for some medical treatment without informing Mother, he has taken the [C]hild out of state without informing Mother, and has taken [the Child] to counseling without informing Mother. These moves are not acceptable and the Court cautions Father that should these things continue in the future, the Court will consider sole physical custody. It is absolutely imperative that the parents communicate with each

other and attempt to make a decision together. If not, joint legal custody will not work.

(Appellant's App. p. 77). Father maintains that this finding was not supported by any evidence. At trial, Mother testified that the Child told her that Father had taken him to a big hotel in Ohio with a big pool. Father refuted this claim by stating he took the Child to Indianapolis. Father's argument that we should believe his testimony is an invitation for us to reweigh the evidence. Father next argues that he informed Mother of the Child's hospital visits, the medication that the Child received, and the fact that he had enrolled the Child for counselling. Although Father informed Mother of his actions, he did so after the fact. According to Indiana Code section 31-9-2-67, 'joint legal custody' means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training. It was crucial for Father to keep Mother informed on any decisions involving the Child. Equally, we find no error with this finding.

## II. *Parenting Time Credit*

Father lastly claims that the trial court erred in calculating his parenting time credit. We may not reverse a parenting time credit determination unless the trial court manifestly abuses its discretion. *Vandenburgh v. Vandenburgh*, 916 N.E.2d 723, 727 (Ind. Ct. App. 2009). "No abuse of discretion occurs if there is a rational basis in the record supporting the trial court's determination." *Saalfrank v. Saalfrank*, 899 N.E.2d 671, 681 (Ind. Ct. App. 2008).

[19] Father challenges the disparity in the overnight credits. When the Order was entered in May 2015, the trial court issued two child support worksheets. In the first worksheet, it indicated Father's gross weekly income as $750 while Mother's was $290. The trial court ordered Father to pay child support of $62 per week commencing July 11, 2014, being the date when Father's petition was filed, until April 3, 2015. That worksheet awarded Father 180 overnights. In the second worksheet, the trial court took into account an increase of Mother's weekly income to $440. Father's income remained the same. In that worksheet, the trial court recalculated Father's child support up to $73. Father was given 100 overnights.

[20] Under Child Support Guideline 6, a non-custodial parent is afforded "credit" to his or her child support obligation for hosting his or her children overnight. The credit is based upon the number of overnights a child or children spends with the non-custodial parent. *Grant v. Hager*, 868 N.E.2d 801, 802 (Ind. 2007). "If the court determines it is necessary to deviate from the parenting time credit, it shall state its reasons in the order." Ind. Child Support Guideline 6.

[21] With respect to overnight credits, the trial court ordered that

> 21. Father shall have parenting time by the [Guidelines] with the exception that he may have his mid week as an overnight as so long as he can get [the Child] to pre-school (and school once he starts) the next morning.

(Appellant's App. p. 88). The commentary to Child Support Guideline 6 states that if the parents are using the Guidelines without extending the weeknight

period to an overnight, then the non-custodial parent would be exercising approximately 98 overnights. Father claims that he is entitled to 150 overnights since the trial court ordered a midweek overnight—an additional 52 overnights. Father has a valid argument; however, Father's explanation fails to state how the trial court came up with 180 days in the first worksheet; nor does the trial court order explain why Father's overnights were reduced to 100. Based on the admittedly incomplete information, and the limited record before us, we cannot determine the annual number of overnights Father is entitled to. Accordingly, we remand to the trial court to modify and correct the child support worksheet to reflect Father's correct overnights.

## CONCLUSION

[22] Based on the foregoing, we conclude that the (1) challenged findings were not erroneous; and (2) we remand to the trial court to amend the child support obligation worksheet to reflect Father's correct overnights.

[23] Affirmed and remanded with instructions.

[24] Najam, J. and May, J. concur